# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 14, 2007 Session

## STATE OF TENNESSEE v. MICHAEL DALE RIMMER

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 98-01033-34     W. Fred Axley, Circuit Judge**

---

**No. W2004-02240-SC-DDT-DD - Filed February 20, 2008**

---

The Defendant, Michael Rimmer, was convicted of one count of premeditated murder, one count of aggravated robbery, and one count of theft of property. In the penalty phase of the trial, the jury imposed a sentence of death for the first degree murder. On appeal as of right, the Court of Criminal Appeals affirmed the convictions, reversed the sentence of death, and remanded to the trial court for a second sentencing hearing. State v. Rimmer (Rimmer I), No. W1999-00637-CCA-R3-DD, 2001 WL 567960 (Tenn. Crim. App. May 25, 2001). At the conclusion of that proceeding, a different jury imposed the death penalty based upon one statutory aggravating circumstance, i.e. that the defendant had a previous conviction for a felony with statutory elements involving violence to the person. Tenn. Code Ann. § 39-13-204(i)(2) (1997). As required for the imposition of a sentence of death, the jury also concluded that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. This sentence was affirmed by the Court of Criminal Appeals. State v. Rimmer (Rimmer II), No. W2004-02240-CCA-R3-DD, 2006 WL 3731206 (Tenn. Crim. App. Dec. 15, 2006). Our review is mandatory. Tenn. Code Ann. § 39-13-206(c)(1) (2006). Upon careful review of the entire record, we hold as follows: (1) although the trial court erred during the sentencing hearing by excluding evidence solely on the grounds of hearsay, the evidence was either introduced through other means or lacking in relevance or reliability, so the error was harmless beyond a reasonable doubt; (2) for a waiver of his right to testify to have been valid, a defendant need not state on the record that he was informed by counsel of our ruling in State v. Cazes, 875 S.W.2d 253, 266 (Tenn. 1994); (3) the jury instruction defining reasonable doubt does not offend due process; (4) references by defense counsel and a defense witness that the defendant previously had been on "death row" did not, under these circumstances, entitle the defendant to a new sentencing hearing; and (5) the sentence of death satisfies the proportionality guidelines. As to the remaining issues, we agree with the conclusions reached by the Court of Criminal Appeals. The relevant portions of the opinion are appended. The judgment of the Court of Criminal Appeals is, therefore, affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Brock Mehler, Nashville, Tennessee, and Joseph Ozment, Memphis, Tennessee, for the appellant, Michael Dale Rimmer.

Robert E. Cooper, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas D. Henderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I.  Procedural and Factual History**

On November 7, 1998, Michael Dale Rimmer (the "Defendant"), a white male, was convicted of theft, aggravated robbery, and the first degree murder of the victim, Ricci Ellsworth. A Shelby County jury imposed the death sentence.  In 2001, the Court of Criminal Appeals affirmed the convictions; however, because of multiple errors that affected the integrity and reliability of the verdict with regard to the presence of aggravating circumstances, a new sentencing hearing was ordered.  See Rimmer I, 2001 WL 567960, at *22-23.  After a remand for a second trial on the issue of penalty only, a different jury also sentenced the Defendant to death, relying upon Tennessee Code Annotated section 39-13-204(i)(2) as the applicable aggravating circumstance; that is, that the Defendant had prior convictions of one or more felonies with statutory elements involving the use of violence to the person.  The State established that in 1985, the Defendant had been convicted of assault with intent to commit robbery, had pleaded guilty to aggravated assault, and, in 1989, had pleaded guilty to three charges involving the murder victim–first degree burglary, aggravated assault, and rape.  In his defense, the Defendant, in hopes of leniency by the jury, attempted to cast doubt on both the murder conviction and his 1989 conviction for rape.  In this second appeal, the Court of Criminal Appeals affirmed.  The terms of Tennessee Code Annotated section 39-13-206(a) mandate our review.

A summary of the testimony offered in both the guilt and penalty phases of the 1997 trial appears in the initial opinion by the Court of Criminal Appeals.  Rimmer I, 2001 WL 567960, at *1-3.  While there are differences in the testimony offered in the two phases of the 1997 trial and that in the resentencing hearing in 2004, they are minor.  Our review pertains to the testimony offered in the latter proceeding.

**II.  Resentencing Hearing**

During the middle 1980's, the Defendant had an on-again-off-again romantic relationship with the victim.  They started dating sometime after the victim obtained a divorce in 1977 from her first husband, Donald Eugene Ellsworth, by whom she had two children.  At the time, the victim was

apparently struggling with a drinking problem and Ellsworth was experiencing drug problems. Later, after his relationship with the victim had come to an end, the Defendant was indicted for the aggravated assault and rape of the victim and the first degree burglary of her residence. In 1989, he entered pleas of guilt to each charge and was sentenced to the Department of Correction.

During his incarceration, the victim often accompanied the Defendant's mother, Sandra Rimmer, on visits to the prison. Because the victim participated in a religious program that ministered to inmates from about 1988 to 1992, she saw the Defendant regularly. According to the Defendant's mother, the victim and the Defendant displayed an affection for each other during the prison visits. Despite this purported renewal of their relationship, however, there was evidence that during this period of time, the Defendant informed two inmates, Roger LeScure and William Conaley, of his desire to kill the victim upon his release from the prison. He even described to LeScure how he intended to dispose of her body. The Defendant explained to the inmates that he blamed the victim for his incarceration and was entitled to money from her.

The Defendant was released by the Department of Correction in October of 1996 and began work at an auto body repair shop in Memphis. By that time, the victim, who was employed as a night auditor at the Memphis Inn, had remarried Donald Ellsworth and had experienced some success in controlling her alcohol problems.

On February 7, 1997, the victim was scheduled to begin her shift at 11:00 p.m. Her husband awakened her and kissed her goodbye. She drove to the hotel in her 1989 Dodge Dynasty. The only access to her office was through a door, which was locked, or through a small opening in the glass security window. Several hotel guests saw the victim at her office desk between 1:00 and 2:00 a.m. Before 2:00 a.m., one of the guests noticed a "dark-maroonish brown" car that had been backed into an area near the hotel entrance. Although it was raining at the time, the trunk was open.

At about 2:30 a.m., Raymond Summers, a railroad supervisor with CSX Transportation, drove to the hotel when the management service was unable to make telephone contact with a work crew, which was staying there overnight. Because no one was at the front desk, Summers entered the office area. When he heard the sound of water running in the office restroom, he looked inside and discovered blood splatters on the sink, the wall, the toilet bowl, and some towels. He reported his findings to Shelby County officers who were leaving a nearby Denny's Restaurant. The officers notified Linda Spencer, the hotel manager, who lived on the premises. When they investigated, they discovered signs of a struggle in the office area. There were "puddles" of blood throughout the restroom. The sink was cracked, and the lid had been ripped off the commode. Police found the victim's purse. There was a trail of blood approximately thirty-nine feet long that led from the restroom, through the equipment room, office, reception area, and to the vending space. The trail ended on the curb outside the night entrance, indicating that the victim may have been dragged from the restroom to the curb. Some $600 in cash was missing from the register, and three sets of sheets had been taken from the equipment room. Officer Robert Moore of the Memphis Police found a green cigarette lighter under a bloody towel and discovered the victim's gold ring between the office and the bathroom.

Sergeant Robert Shemwell of the homicide department testified that during the investigation the police questioned Richard Rimmer, the Defendant's brother, and Richard Rimmer's ex-girlfriend, Joyce Frazier. According to Sergeant Shemwell, the Defendant appeared at his brother's house during the morning hours after the murder. The Defendant's car was muddy and so were his shoes. The back seat of the car appeared to be wet. There was a shovel inside. The Defendant had asked Richard Rimmer, who was a carpet cleaner, if he knew how to get blood out of carpet. Richard Rimmer admitted that sometime after he had learned of the victim's disappearance, he disposed of the shovel in a dumpster.

The police learned that the Defendant left Memphis without taking the last paycheck he was due from his employer. He gave no notice of his departure. He also left without taking his work tools or the clothing he had stored in the room he occupied.

On March 5, 1997, Michael Adams, a Johnson County, Indiana deputy, stopped the Defendant, checked the license plate number on the Honda, and determined that the vehicle had been reported as stolen in early January. The Defendant was arrested for possession of a stolen vehicle and public intoxication. He registered .06 on a blood-alcohol test. A receipt in the vehicle indicated that the Defendant was in Myrtle, Mississippi on the day after the victim's disappearance. Receipts from Florida, Missouri, Wyoming, Montana, California, Arizona, and Texas with dates ranging from February 13, five days after the police were alerted of the crime, to March 3, 1997, two days before the Defendant's arrest, were found in the vehicle.

There were blood stains on the carpet and on a seat belt in the back seat of the Honda. Subsequent testing of the stains in the car revealed that the DNA from the blood was consistent with the bloodline of the victim's mother, Marjorie Floyd, who lived in Florence, Alabama. It was also consistent with the blood type of the victim, as compared through a sample previously taken from a pap smear. Frank Baetchel, the FBI forensic expert who performed the tests, also examined a bloody hotel towel found at the Memphis Inn, concluding that the blood sample matched the stains found inside the Honda.

According to Sergeant Shemwell, the Defendant attempted to escape from Indiana authorities on at least two different occasions. Initially, they caught him trying to cut through a fence with nail clippers. Afterward, the officers there found two home-made shanks that he had made in his cell. While in route to Tennessee, the Defendant attempted to escape a second time, gaining control of the extradition van, which included three other inmates, and driving four hours before finally being apprehended by the authorities. A third attempt took place at the Shelby County Jail.

During the course of the investigation, the police had explored numerous leads. One report indicated that between 1:45 and 2:00 a.m., James Darnell, along with Dixie Roberts, saw two white males at the Memphis Inn. It was dark and the weather was rainy. He said that both men had blood on their knuckles and appeared to have been fighting. Darnell told officers that one of the men, who he believed to be a clerk, was behind the hotel window and appeared to be giving change to the other. Darnell inferred that the clerk was trying to get the other man, who was "very drunk," to

leave. Darnell also saw a dark-colored car "backed in front of the night entrance." Darnell, when shown a photographic line-up, was unable to identify the Defendant as one of the two men. Two composite drawings were made of these individuals, based on Darnell's descriptions. This evidence was not presented to the guilt-phase jury. Although Darnell's testimony was presented at the resentencing hearing through Officer Shemwell, the composite drawings were not.

The Defendant's mother, Sandra Rimmer, testified on his behalf, confirming that the victim had visited the Defendant while he was in prison. She claimed that the Defendant was innocent of the rape charge and contended that the victim admitted fabricating her claims, saying that her boyfriend at the time, Tommy Voyles, was pushing her to file the charges. Ms. Rimmer also testified that the victim sent photographs to the Defendant while he was in prison and "acted like" his girlfriend. Prison records indicated that the victim ceased visitation with the Defendant after her remarriage to Donald Ellsworth.

The defense also presented testimony by a sociologist and mitigation specialist, Dr. Ann Marie Charvat, who had interviewed the Defendant and had conducted a study of his background. She testified that she had learned that the Defendant's parents married very young and then had three children in quick succession, the Defendant being the middle child. Thereafter, the family moved from Memphis to Houston, where the father was arrested for a minor offense and placed on probation, and then to Indianapolis, where the parents divorced. Later, the parents remarried and returned with the children to the Memphis area. The father worked for the city government and, when the mother left the residence to work full-time, the Defendant, at age eleven, first began to exhibit behavioral problems at school. The Defendant was a "C" student but, according to the mitigation expert, would have benefitted from special education classes. Dr. Charvat testified that the Defendant was hospitalized as an adolescent during a time his father was being treated for mental illness. Afterward, the Defendant was hospitalized on at least two other occasions, one of which was the direct result of his involvement with an older woman, possibly a teacher. The Defendant dropped out of school in the ninth grade and began working at a gas station and in his father's shop.

At eighteen, the Defendant was arrested and served a prison sentence. Although the incident came about when he and some friends attempted to purchase some marijuana, he was the only one involved to serve a term in prison. The others received jail terms or probationary sentences. Dr. Charvat learned that while the Defendant was in prison, he met an inmate, Jimmy Watson, who had a relationship with the victim, Ricci Ellsworth. When the couple broke up, the Defendant became involved with the victim. Upon his release from prison, he lived with the victim and her children, describing this period as the happiest time in his life. Dr. Charvat also understood that the Defendant resumed his relationship with the victim, through prison visits, even after he had entered his guilty pleas to the burglary and to her assault and rape. The names of the victim's two children also were on the prison visitation list.

Barbara Dycus, a prison minister at the West Tennessee State Penitentiary, testified that the victim was engaged to the Defendant in 1993, a year before she remarried Donald Ellsworth. She stated that the Defendant played music, wrote gospel songs, and sang during their religious services.

Thomas Mach, another prison minister, confirmed that the Defendant had encouraged other inmates to participate in the various programs, including Bible study. During his testimony and in response to a question posed by defense counsel, Mach mentioned that he had met the Defendant on "death row." Defense counsel repeated the term during direct examination. Mach made two more references to "death row" in the context of when he met the Defendant.

Throughout the resentencing hearing, the State made numerous objections on grounds of relevancy and hearsay, most of which were overruled. The trial court did, however, sustain at least three objections by the State, thereby excluding some of the evidence offered by the defense. The first was a statement by Sandra Rimmer, who claimed that immediately before the victim made the rape accusation, Voyles had offered to persuade the victim to drop the charges in exchange for $5,000. The trial court concluded that the testimony fell "outside the acceptable hearsay rule as it applies to this sentencing hearing."

Although the jury also did not see the composite drawing of the two unidentified men who were seen at the Memphis Inn near the time of the victim's disappearance, the jury heard Sergeant Shemwell testify that these drawings existed. Even though the sentencing jury heard about Darnell's account of the two men, the defense was not allowed to inform the sentencing jury that the original, convicting jury did not hear evidence about these same two men.

After weighing evidence from both sides, the jury returned a sentence of death. The sole aggravating factor was the presence of prior felony convictions with statutory elements involving the use of violence to the person. The jury concluded that this aggravating factor outweighed all mitigating factors. Upon first tier review, the Court of Criminal Appeals upheld the death sentence.

### III. Analysis
### Exclusion of Mitigating Evidence

The Defendant first argues that because the trial court erred by sustaining the State's evidentiary objections as to three subjects of testimony, he is entitled to a new sentencing hearing. He contends that the trial court failed adequately to relax the Tennessee Rules of Evidence as required by law.[1] The State asserted that even though the trial court sustained its objections on

---

[1] A sentencing jury in a capital case "must not be precluded from considering any relevant mitigating evidence." State v. Thompson, 768 S.W.2d 239, 251 (Tenn. 1989), cert. denied, 497 U.S. 1031 (1990). The Eighth Amendment to the United States Constitution "requires States to allow consideration of mitigating evidence in capital cases." In McKoy v. North Carolina, 494 U.S. 433 (1990), our highest court made the following observation:

> [I]t is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling . . . . Whatever the cause, . . . the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of Lockett [v. Ohio, 438 U.S. 586 (1978)], it is our duty to remand this case for resentencing."

(continued...)

hearsay grounds, the jury nevertheless heard the testimony at issue and, in consequence, there was no error. While the Court of Criminal Appeals indicated that the trial court should not have sustained several of the objections on grounds of hearsay, it ruled that any error was harmless because the sentencing jury learned of the evidence through other means.

Generally, the standard of review of evidentiary rulings by a trial court is one of abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). However, we afford the trial court's conclusions of law no deference. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001).

The standard for admission of evidence during the guilt phase is different from that in the penalty phase. During the guilt phase of the trial, the rules of evidence control. The penalty phase, however, is controlled by a separate statute:

> In the sentencing proceeding, evidence may be presented as to <u>any</u> <u>matter that</u> <u>the court deems relevant to the punishment</u>, and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (I); and any evidence tending to establish or rebut any mitigating factors. Any such evidence that the court deems to have probative value on the issue of punishment may be received, <u>regardless of its</u> <u>admissibility under the rules of evidence</u>; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

Tenn. Code Ann. § 39-13-204(c) (2006) (emphasis added). While the trial court has some discretionary authority, the purpose of the statute is to permit any probative evidence of mitigation. The plain language of the legislation prohibits the exclusion of mitigating evidence merely because it is hearsay. This Court has addressed this specific issue:

> The rules of evidence . . . do not limit the admissibility of evidence in a capital sentencing proceeding. Our statute empowers "trial judges [with] wider discretion than would normally be allowed under the Tennessee Rules of Evidence" in the admission of evidence during the penalty phase of a capital case. "The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." Because the rules of evidence "are too restrictive and unwieldy in the arena of capital sentencing," the terms of the statute apply.

State v. Reid, 213 S.W.3d 792, 817 (Tenn. 2006) (citations omitted).

---

[1](...continued)
Id. at 442 (quoting Mills v. Maryland, 486 U.S. 367, 375 (1988)) (citations omitted).

In Chambers v. Mississippi, 410 U.S. 284 (1973), the United States Supreme Court ruled the "the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id. at 302. The pertinent inquiry as to its admissibility is whether the proposed evidence is "reliable and relevant to one of the aggravating or mitigating circumstances." Reid, 213 S.W.3d at 817. If so, hearsay should be permitted in a capital sentencing hearing. State v. Austin, 87 S.W.3d 447, 459 (Tenn. 2002).

Also, this Court has consistently ruled that proof of residual doubt is relevant in a capital sentencing hearing as a "non-statutory mitigating circumstance." Austin, 87 S.W.3d at 459; State v. Hartman, 42 S.W.3d 44, 55 (Tenn. 2001). That the victim's boyfriend may have attempted to extort the Defendant would tend to cast residual doubt on his previous rape conviction, an offense upon which the jury relied as the aggravating circumstance warranting the sentence of death. Further, a composite drawing of other possible suspects could be utilized in any effort to cast doubt on the underlying first degree murder conviction, as could the presence of others at the crime scene. In theory, the evidence might tend to show that someone else committed the crime and, in view of that, the death penalty should not be imposed.

If the trial court employed an erroneous standard to exclude evidence of residual doubt or other mitigating evidence in the sentencing phase of the trial, that does not end the analysis. Austin, 87 S.W.3d at 459 (citing State v. Cauthern, 967 S.W.2d 726, 739 (Tenn. 1998)). The death sentence may stand if the error can be classified, in the context of the entire proceeding, as harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967); State v. Howell, 868 S.W.2d 238, 244 (Tenn. 1993). Although the State bears the burden of persuasion, the exclusion of proof is harmless when we can conclude beyond a reasonable doubt that the sentence would have been the same even if the excluded evidence had been allowed. Cauthern, 967 S.W.2d at 739 (citing Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988)).

## A. Rebuttal of Aggravating Circumstance

The Defendant first argues that the trial court erred by excluding the testimony of his mother, Sandra Rimmer, about the attempted extortion. The following exchange took place on the subject:

| | |
|---|---|
| Sandra Rimmer: | I talked to Tommy on the phone when all this happened and [the Defendant] was arrested [for rape]. |
| Defense Counsel: | Tommy who? |
| Sandra Rimmer: | I don't remember his last name. |
| Assistant D.A.: | I object to this hearsay. |

After a lengthy argument, the trial court observed that while the evidence was relevant, "it's not admissible, even in a sentencing hearing. . . . If I could let it in, I would. . . . Objection sustained. . . . It's hearsay." The defense then offered proof out of the presence of the jury. Sandra Rimmer told of her conversation with Voyles, "[I]f I could give him $5,000 [the victim] would drop the [rape] charges against [the Defendant]." Because the trial court excluded this evidence strictly upon

-8-

hearsay grounds, there was error. See Tenn. Code Ann. § 39-13-204(c) (2006). As stated, the testimony is probative by the terms of the statute because, if believed, it might cast doubt on the validity of the rape conviction. See Austin, 87 S.W.3d at 459.

That Voyles may have attempted to extort Sandra Rimmer in exchange for the dismissal of the rape charge was indeed relevant and the trial court should have permitted the testimony. On the other hand, the Defendant ultimately pleaded guilty to the rape and also to burglary and aggravated assault. A court of competent jurisdiction approved the plea and the Defendant served his sentence fully without any collateral challenge, post-conviction or otherwise, to the judgment. So, even if Voyles unlawfully attempted to solicit funds from the Defendant's mother, that does not mean that the Defendant was innocent of the crimes. Importantly, the jury heard Sandra Rimmer testify that the victim had told her that the Defendant did not rape her and that "Tommy" was pressuring her to bring the charges: "Tommy was pushing her into the charges. [The victim] said she felt that she was pushed into it . . . . Everybody was upset. Because I couldn't understand why she would want to see him if he raped her . . . ." This testimony was of greater relevance to the residual doubt defense, and yet it was altogether rejected by the sentencing jury because the verdict form listed the Defendant's 1989 convictions as part of the basis for finding the aggravating circumstance.[2]

Even if Voyles had attempted to extort funds in exchange for the victim's refusal to cooperate with the prosecution, that hardly trumps a knowing and voluntary guilty plea afterward, with all of the required admonitions, by the Defendant, to the charge of rape.[3] See, e.g., Boykin v. Alabama,

---

[2] The verdict form also listed the Defendant's 1985 felony convictions.

[3] Rule 11(b) of the Tennessee Rules of Criminal Procedure provides as follows:
Considering and Accepting a Guilty or Nolo Contendere Plea. –
(1) Advising and Questioning the Defendant. – Before accepting a guilty or nolo contendere plea, the court shall address the defendant personally in open court and inform the defendant of, and determine that he or she understands, the following:
    (A) The nature of the charge to which the plea is offered;
    (B) the maximum possible penalty and any mandatory minimum penalty;
    (C) if the defendant is not represented by an attorney, the right to be represented by counsel–and if necessary have the court appoint counsel–at trial and every other stage of the proceeding;
    (D) the right to plead not guilty or, having already so pleaded, to persist in that plea;
    (E) the right to a jury trial;
    (F) the right to confront and cross-examine adverse witnesses;
    (G) the right to be protected from compelled self-incrimination;
    (H) if the defendant pleads guilty or nolo contendere, the defendant waives the right to a trial and there will not be a further trial of any kind except as to sentence; and
    (I) if the defendant pleads guilty or nolo contendere, the court may ask the defendant questions about the offense to which he or she has pleaded. If the defendant answers these questions under oath, on the record, and in the presence of counsel, the answers may later be used against the defendant in a prosecution for perjury or aggravated perjury.
(2) Insuring That Plea Is Voluntary. – Before accepting a plea of guilty or nolo contendere, the court shall address the defendant personally in open court and determine that the plea is voluntary and is not

(continued...)

-9-

395 U.S. 238, 242-44 (1969). Because "the essence of the excluded evidence was ultimately presented to the jury[,]" we, like the Court of Criminal Appeals, find beyond a reasonable doubt that the introduction of this portion of the Defendant's mother's testimony would not have affected the verdict of the jury. State v. Thacker, 164 S.W.3d 208, 225 (Tenn. 2005).

## B. Residual Doubt

Next, the Defendant claims that "[t]he resentencing jury remained unaware that the [convicting] jury never considered the evidence of two other possible perpetrators before it convicted the [Defendant]." We note that the sentencing jury did hear, through Sergeant Shemwell, that James Darnell had reported seeing two men at the Memphis Inn near the time of the murder, but the Defendant specifically takes issue with the trial court's exclusion of evidence, during the sentencing phase, indicating that the convicting jury had not been made aware of the two other suspects. Apparently, the Defendant contends that if the convicting jury had known about the other two men spotted at the scene, it may not have found the Defendant guilty beyond a reasonable doubt; thus, the fact that this evidence was excluded at trial would show residual doubt by discrediting the convicting jury's verdict in the minds of the sentencing jury.

We have previously stated that we decline to split hairs between evidence that "does nothing more than impeach the verdict of the original jury and evidence that directly mitigates culpability by showing that the defendant was not involved in the crime." Hartman, 42 S.W.3d at 57. Thus, a trial court, in its discretion, conceivably could have found this information admissible when applying the proper standard under Tennessee Code Annotated section 39-13-204(c). However, even if this proof meets the liberal admissibility threshold of Tennessee Code Annotated section 39-13-204(c), its exclusion at this Defendant's sentencing hearing had no impact on the trial. The Court of Criminal Appeals properly resolved the issue, holding that because the sentencing jury did hear the very evidence at issue, any error was harmless beyond a reasonable doubt:

> At the re-sentencing hearing, Sergeant Robert Shemwell testified he had talked with James Darnell who had attempted to check into the Memphis Inn that morning. James Darnell reported that he and Dixie Roberts went to the Memphis Inn between 1:45 a.m. and 2:00 a.m. on February 8, 1997. Darnell observed through the check-out window a white male bleeding from his hands and another white male on the other side of the check-out window. He . . . described the first male as being in his early twenties, long red hair, wearing an orange ball cap and wearing blue jeans. Darnell stated that the man appeared very drunk. Darnell believed the other man to

---

[3](...continued)

the result of force, threats, or promises (other than promises in a plea agreement). The court shall also inquire whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the district attorney general and the defendant or the defendant's attorney.

(3) Determining Factual Basis for Plea. – Before entering judgment on a guilty plea, the court shall determine that there is factual basis for the plea.

have been the clerk. He described the second male as being thirty years of age, long brown hair, moustache and wearing blue jeans. Darnell observed the man believed to be the clerk hand money through the check out window to the other male. Darnell was uncomfortable with the situation and left . . . . Photographs of suspects [later] were sent to Darnell via the Federal Bureau of Investigation. Darnell could not positively identify either man from the photospread. A photograph of [the Defendant] was included in the photospread.

Rimmer II, 2006 WL 3731206, at *16. In our view, the contested proof would have had a negligible effect on whether the sentencing jury believed that the Defendant actually committed the first-degree murder, which is the key inquiry of residual doubt. While this evidence at the sentencing phase theoretically may have contributed to the Defendant's residual doubt argument, this omission, in the context of the entire sentencing hearing, can be classified as harmless beyond a reasonable doubt. In short, the sentencing jury heard testimony of Darnell and had the opportunity to consider the validity of the conviction.

Finally, the Defendant argues that the composite drawings, made from Darnell's descriptions, of the men seen at the Memphis Inn should have been permitted into evidence. The defense argument is similar to that made on the prior issue. The drawings were products of hearsay, but as stated, this fact alone would not render them inadmissible in a sentencing hearing. The drawings were relevant under section 39-13-204(c) because they would tend to show that the police had a more reasonable basis for considering these other suspects during the course of the investigation. A description of either of the two men at the crime scene lends some credence to the residual doubt claim. Theoretically, the evidence might cast some doubt on the validity of the murder conviction:

Both the statute and prior case law dictate that the defendant has the right to present at the sentencing hearing, whether by the jury which heard the guilt phase or by a jury on resentencing, evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability. Evidence otherwise admissible under the pleadings and applicable rules of evidence, is not rendered inadmissible because it may show that the defendant did not kill the victim, so long as it is probative on the issue of the defendant's punishment.

State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995).

In the context of this sentencing hearing, however, we can conclude that the exclusion of the drawings also qualifies as harmless beyond a reasonable doubt. The sentencing jury was made aware that the police had considered other possibilities during the investigation. Sergeant Shemwell read a report into the record indicating that the witness "saw a male white bleeding from his hands and another male white on the other side of the check out glass and office area, with also, what appeared to be blood on his knuckles." Darnell provided the officers with descriptions of the men. The sentencing jury had the opportunity to consider those facts as indicative of reasonable doubt and yet chose to impose a death sentence.

-11-

In summary, we hold that erroneous exclusion of the mitigating evidence was ultimately harmless under the circumstances of this sentencing hearing. For future reference, however, objections made in capital sentencing hearings based purely upon the rule against hearsay have no basis in law.

## Waiver of the Right to Testify

The Defendant contends that the waiver of his right to testify was not knowing, intelligent, and voluntary. He argues that in a capital sentencing hearing, the trial court has the obligation to inform defendants that if they limit their testimony on direct examination to mitigating circumstances, they cannot be questioned about the circumstances of the murder. See Cazes, 875 S.W.2d at 266. In Momon v. State, 18 S.W.3d 152 (Tenn. 1999), we held that the right of the defendant to testify is fundamental and can only be waived in person and there must be evidence in the record demonstrating "an intentional relinquishment or abandonment of a known right or privilege" by the Defendant. Id. at 161-62 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). After concluding that a silent record was not enough, we then outlined specific procedures for ensuring that a waiver is properly recorded. The defense should request and the trial judge should permit a hearing out of the presence of the jury to establish on the record that the defendant has personally made a knowing, intelligent, and voluntary waiver. The trial court must determine that

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

Id. at 162. The defense counsel should ask the defendant these questions and, under ordinary circumstances, "the trial judge should play no role in this procedure." Id. We observed that this approach limits judicial interference, striking an appropriate balance between safeguarding a precious right and preserving the confidential relationship between an attorney and his client. Id.[4] This procedural requirement represents "an effort to protect the fundamental right of the accused to testify in a criminal trial and to ensure that any waiver of that right was personal, knowing, and voluntary . . . ." State v. Copeland, 226 S.W.3d 287, 304 (Tenn. 2007).

The Defendant concedes that the trial court conducted a hearing out of the presence of the jury under the guise of Momon. During questioning by his counsel, the Defendant acknowledged

---

[4] It is only when defense counsel fails to adequately obtain a waiver that the trial judge should intervene. Momon, 18 S.W.3d at 162. The failure to comply with the ruling in Momon will not serve as a ground for relief if the record otherwise establishes a personal waiver of the right to testify. Id. at 163.

that he had been informed of his right to testify in the sentencing hearing and that he had personally made the decision not to do so. In this appeal, however, he contends that his right to testify was not properly waived because his counsel did not inform him about the limits to cross-examination in capital cases. Cazes, 875 S.W.2d at 266. In Cazes, this Court held that a defendant does not waive his Fifth Amendment right against self-incrimination by testifying to mitigating factors that are wholly collateral to the murder. Id. The State conceded that Cazes should not have been subjected to cross-examination except as to the mitigating circumstances and this Court agreed. Id. at 264-266; see also Harrison v. United States, 392 U.S. 219, 222 (1968) (a "defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives . . . ."). Here, the Defendant contends that if his counsel had informed him of the Cazes ruling, he would have chosen to testify instead of insisting upon his right to remain silent.

The discrete question presented is whether a defendant must be informed of his ability to testify to collateral mitigating factors in a death penalty sentencing hearing without waiving his privilege against self-incrimination. That is, must a defendant be informed of the ruling in Cazes as part of a Momon hearing in capital sentencing cases? We say no.

Other jurisdictions have a similar "colloquy requirement," for obtaining a valid waiver of the right to testify, as that found in Momon. See, e.g., LaVigne v. State, 812 P.2d 217, 222 (Alaska 1991); People v. Curtis, 681 P.2d 504, 514-15 (Colo. 1984); Tachibana v. State, 900 P.2d 1293, 1303-04 (Haw. 1995); State v. Neuman, 371 S.E.2d 77, 81-82 (W. Va. 1988). However, the Defendant has not cited, and we have not found, a case from any other jurisdiction that requires a defendant to acknowledge his awareness of a limited cross-examination rule. Likewise, we are apprehensive to expand the Momon inquiry to include specifics of the advice given by defense counsel. The three general inquiries laid out in Momon are sufficient to ensure a personal waiver of the right to testify in a sentencing hearing. See People v. York, 897 P.2d 848, 851 (Colo. Ct. App. 1994) ("We are not aware of any authority indicating that the trial court is required to advise a defendant about every strategic consequence of testifying, or about the consequences of testifying to specific facts.") (emphasis omitted).

In Momon, this Court specifically acknowledged "the need to protect the relationship and confidences between defense counsel and his or her client." Momon, 18 S.W.3d at 162. "The procedures are prophylactic measures which are not themselves constitutionally required." Id. at 163. Any additional procedural mandates must not cross the line of propriety. In our view, an expanded Momon proceeding, requiring a defendant and his counsel to place on the record the advantages and disadvantages of testifying in open court, would infringe upon the attorney-client privilege. In general, courts should guard against overreaching intrusions into the specifics of the defense strategy. The right is to the effective assistance of counsel. A corresponding admonishment is against too much "judicial interference with the attorney-client relationship." Id.

The record reflects that the Defendant, professing complete awareness of his right to testify, acknowledged that his decision not to do so was his personal desire. Rimmer II, 2006 WL 3731206, at *21. He also admitted that he had discussed his right to testify throughout the trial with his two

-13-

attorneys and had made his choice by the time of his sentencing hearing: "Yes, sir. I have made that decision. . . . The burden of proof is on the State, it is not on me, so therefore I am not going to take the stand. . . ." The trial judge then confirmed that the decision was an individual one, to which the Defendant responded, "[T]his is of my own free will and accord." These facts make the Defendant's case clearly distinguishable from the situation we addressed in Momon.

In Momon, the defense counsel unilaterally decided that his client would not testify. He first informed Momon of that fact as they were entering the courtroom for trial. Momon, 18 S.W.3d at 163. There was no indication that counsel had spent any time explaining to Momon the advantages and disadvantages of testifying. Id. That was not the case here. The Defendant's only complaint is that his counsel did not explain on the record our ruling in Cazes, which recognized the right of a defendant to testify to mitigating factors without waiving his privilege against self-incrimination. That alone is not sufficient to prove that the Defendant's waiver was not knowing, voluntary, and intelligent. That the Defendant acknowledged his awareness of the advantages and pitfalls of testifying is sufficient to satisfy Momon.

Informing defendants of our ruling in Cazes may be a good practice for defense attorneys, but a communication of that nature falls within the attorney-client privilege. We are unwilling to hold that failure to explain this evidentiary rule on the record invalidates the waiver of the right to testify.

**Jury Instruction**

The Defendant next takes issue with the jury instruction defining "reasonable doubt." He argues that the definition lowered the burden of proof, in violation of the due process clause in the United States Constitution and the law of the land provision in the Tennessee Constitution. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8 ("That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land"); see also Cage v. Louisiana, 498 U.S. 39, 41 (1990) (holding that a jury instruction permitting a conviction on proof less than beyond a reasonable doubt violates due process). The trial court instructed the jury as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt.
> Reasonable doubt does not mean a doubt that may arise from possibility.
> Absolute certainty is not demanded by the law.

The Defendant specifically calls our attention to the words "[r]easonable doubt does not mean a doubt that may arise from possibility." He argues that this sentence lowered the burden of proof from guilt beyond a reasonable doubt.

-14-

In Cage, the United States Supreme Court held unconstitutional an instruction equating reasonable doubt with "actual substantial doubt" and "grave uncertainty." The Court held that "[w]hen those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Id. at 41.

In Victor v. Nebraska, 511 U.S. 1 (1994), the Supreme Court considered the definition of reasonable doubt given in the trial of two criminal defendants from two state courts. Jurors in the first case were told that they must have "an abiding conviction, to a moral certainty, of the truth of the charge" in order to meet the reasonable doubt standard. Id. at 7. In the second case, the instruction provided that a reasonable doubt is "an actual and substantial doubt" and that the jury must have "an abiding conviction, to a moral certainty, of the guilt of the accused." Id. at 18. The Supreme Court concluded that while they would not "condone" the use of the term "moral certainty," the instructions were distinguishable from those given in Cage because the jurors were instructed to base their verdict on the evidence rather than any other factor which might conceivably allow a conviction on a standard lower than reasonable doubt. Id. at 21-22. Further, the Court stated that "instructing the jurors that they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase 'moral certainty' might be misunderstood in the abstract." Id. at 21.

The specific instruction under review comes from the Tennessee Pattern Jury Instructions for criminal trials. T.P.I. Crim. 2.03 (5th ed. 2000). As we have previously noted, pattern jury instructions are only suggestions for a trial court because they are "not officially approved by this Court or by the General Assembly and should be used only after careful analysis." State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997). Thus, pattern jury instructions are not entitled to any particular deference on review. Still, this Court has previously upheld the constitutionality of a similar instruction. State v. Hall, 976 S.W.2d 121 app. at 159 (Tenn. 1998). In fairness, however, the focus in Hall was on the use of the phrase "moral certainty" and whether that implied a lesser standard of proof required by the State. Id. app. at 170-71. The Defendant complains that "[r]easonable doubt does not mean a doubt that may arise from possibility" is ambiguous terminology. He asserts that the jury might have understood the instruction to permit a conviction on insufficient evidence.

Jury instructions must be reviewed in their entirety. State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004). Phrases may not be examined in isolation. State v. Dellinger, 79 S.W.3d 458 app. at 502 (Tenn. 2002). The sentence preceding the phrase at issue explains that reasonable doubt is the inability to "let the mind rest easily upon the certainty of guilt" after reviewing all the facts. The sentence following directs that absolute certainty of guilt is not required. In context, a fair interpretation is that reasonable doubt does not mean a doubt that may arise from mere possibility no matter how improbable.

Further, in order to determine whether there was harm to the Defendant by an ambiguous erroneous instruction, we must consider "whether the ailing instruction by itself so infected the entire

-15-

trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). In Estelle v. McGuire, 502 U.S. 62, 72 (1991), the Court determined that the significant question was "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). One ambiguous term does not necessarily constitute error:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Hodges, 944 S.W.2d at 352 (quoting Boyde, 494 U.S. at 380-81). By the application of this standard, we do not find a reasonable likelihood that the jury applied the burden of proof in an unconstitutional way. See Estelle, 502 U.S. at 72.

Although this jury instruction did not result in a denial of due process in this context, we acknowledge the language of this particular instruction may not be helpful. As such, we discourage the further use of this instruction.

### Reference to "Death Row"

The term "death row" was used three times during the testimony of Thomas Mach, a mitigation witness for the defense:

> [Counsel for Defendant]: And how is it that you know Mr. Michael Rimmer?
> [Witness]: I visited him in prison. I'm involved in prison ministry at Riverbend.
> . . . .
> [Counsel for Defendant]: Now, you stated you met Michael while he was on death row?
> [Witness]: Yes, sir.
> [Counsel for Defendant]: And how would you describe his interest in the services and the worship services?
> [Witness]: Michael's done amazing things in unit four. When he was taken off of death row and went to unit four, . . . he got eighteen men interested in the [B]ible .
> . . .

The following colloquy occurred on cross-examination of the witness:

> [State]: How long have you known the defendant in prison?
> [Witness]: Since I met him on death row.

-16-

No objections were made during any of these instances. During final argument, the subject was not addressed.

The State argues that because the Defendant did not raise this issue in his motion for new trial, it has been waived. We disagree. Because this is a capital case, the Defendant may raise this on review at this stage because of the exception to the waiver doctrine in capital cases. See State v. Nesbit, 978 S.W.2d 872, 880-81 (Tenn. 1998). This exception arises from the legislative mandate that this Court review all capital cases. Tenn. Code Ann. § 39-13-206 (2006). This is consistent with our prior practice. In other cases of mandatory review, we have noted that "[i]n light of this clear statutory directive, it would be anomalous, in our view, to hold that review is precluded because the motion for new trial was not timely filed." Nesbit, 978 S.W.2d at 880-81.

While the issue is reviewable, we nevertheless hold that the Defendant is not entitled to relief. The United States Supreme Court has held that introduction of prior evidence of a death sentence was not constitutional error when the evidence did not "affirmatively [mislead] the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." Romano v. Oklahoma, 512 U.S. 1, 10 (1994). We have previously stated that "it is clearly improper, as a general rule, to inform a jury at a resentencing hearing that at a prior trial Defendant was sentenced to death." State v. Miller, 771 S.W.2d 401, 404 (Tenn. 1989). However, this "general" bar against the sentencing jury hearing evidence of a prior sentence of death is subject to qualification. In Miller, for example, this Court recognized that a defendant could open the door to questions about "death row." Id. The defense wanted to present evidence that Miller had become a "born again" Christian. The prosecution did not object to this evidence but wanted to cross examine the witness to show that at the time Miller had been baptized, he was under a sentence of death from a previous trial. In a pretrial hearing, the trial judge ordered that the defense could offer evidence that Miller had found religion, but also permitted the State to cross examine the witness about the fact that he had been under a sentence of death at the time. The defense decided not to admit the evidence and appealed the ruling. This Court refused to find error, holding that when a defendant claims a "change of heart," the circumstances of the conversion are relevant, including that he was on death row at the time. Id. We observed that the propriety of the admission of the prior death sentence would depend upon the "manner in which the State . . . introduced evidence of the prior sentence . . . ." Id.

This case is factually distinguishable from Miller. The jury never actually heard evidence that Miller had been on death row because he chose not to testify after the pretrial ruling. Id. Here, the reference to death row during the sentencing hearing was first made by a defense witness in response to a question by defense counsel. Generally, proof that a defendant in a resentencing hearing has previously been sentenced to die is improper; whether it is reversible error depends on the specific manner in which the evidence was presented. Id.[5]

_____

[5] "[W]here defendant insists upon introducing proof of a religious conversion, the State is entitled to probe the circumstances of the conversion and where such change of heart occurs after

(continued...)

The first reference to death row by the witness Mach appears to have been inadvertent. During the line of questioning by defense counsel, Mach mentioned "death row" in the context of their first meeting. The third reference came from the same witness in response to a question by the State, asking how long he had been acquainted with the Defendant. He responded, "Since I met him on death row."

The nature and context of the prosecutor's question does not suggest that it was calculated to solicit the specific response about "death row." The witness could have just as likely have said he had known the Defendant for a specific period of time or since he met him in prison, and the jury was already aware that the Defendant had spent time there. There is no evidence that it was the intention of the prosecutor to use the fact that the Defendant had been on "death row" to prejudice the Defendant. To the contrary, the State neither drew attention to the mention of "death row" at the time it occurred nor did the prosecutor bring it up during closing arguments. Given the circumstances and the "manner" in which the allusion to "death row" came out, the Defendant is not entitled to relief. See Miller, 771 S.W.2d at 404. As the United States Supreme Court noted, "it is virtually impossible to shield jurors from every . . . influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217 (1982).

Because the references to death row were by a defense witness in response to questions by defense counsel and because the State neither solicited nor actively used that fact in the prosecution, the general rule prohibiting such references is inapplicable.

## Mandatory Review Criteria

Tennessee Code Annotated section 39-13-206(c)(1) requires this Court to determine whether the sentence of death was arbitrarily imposed, whether the evidence presented at the sentencing hearing supported the jury's finding that the aggravating circumstances were established beyond a reasonable doubt, whether the aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt, and whether the sentence of death was excessive or disproportionate considering similar cases. Tenn. Code Ann. § 39-13-206(c)(1) (2006).

## Aggravating and Mitigating Circumstances

This Court must determine whether the evidence supported the jury's finding that the aggravating circumstances were established beyond a reasonable doubt and outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(B)-(C) (2006). In this case, the jury found one aggravating circumstance beyond a reasonable doubt: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose

[5](...continued)
a jury has sentenced . . . death, that fact is clearly relevant and admissible." Miller, 771 S.W.2d at 404.

statutory elements involve the use of violence to the person[.]" Tenn. Code Ann. § 39-13-204(i)(2) (1997).

During the sentencing hearing, the State introduced evidence that the Defendant had been convicted of assault with intent to commit robbery with a deadly weapon and pleaded guilty to aggravated assault in 1985. The proof also established that in 1989, the Defendant pleaded guilty to the aggravated assault and rape of the victim. All of these offenses involved the use of violence to the person. The Defendant attempted to impeach the conviction for rape through testimony by his mother, Sandra Rimmer. She testified that the victim had confided in her that her boyfriend, Tommy Voyles, had pushed her into bringing the rape charges. The jury implicitly considered this testimony unpersuasive because they found that the State had established the prior violent felony aggravating circumstance beyond a reasonable doubt. In our view, the evidence presented was sufficient to support the jury's finding.

In mitigation, an expert testified about the Defendant's unstable childhood, his hospitalization for mental problems, and his dropping out of school and entering the workforce at such a young age. There were also three witnesses who testified to the Defendant's religious conversion. They confirmed his active participation in religious services at the prison. The defense also made an effort to establish residual doubt as to whether the Defendant actually committed the murder. The Defendant advanced alternative theories that either Donald Ellsworth murdered the victim and framed the Defendant by planting her blood in the back seat of his car or that the two unidentified men seen at the Memphis Inn were guilty of the crime.

The jury had an adequate basis to find that the Defendant's troubled childhood and his later religious convictions were not sufficient to outweigh the taint of his prior violent felony convictions. Moreover, the residual doubt evidence was not persuasive given the weight of the overwhelming circumstantial evidence against the Defendant, including his repeated efforts to escape. See State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985) ("A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt."). In our assessment, a reasonable juror could have either discounted any residual doubt testimony or given it very little consideration. Taken as a whole, the evidence sufficiently supports the jury's conclusion that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

### Proportionality Review and Arbitrariness

When a defendant has been sentenced to death, the Tennessee Supreme Court must engage in a comparative proportionality review. Tenn. Code Ann. § 39-13-206(c)(1)(D) (2006). The purpose of this review is "to ensure that the death penalty is applied consistently and not arbitrarily or capriciously." Terry v. State, 46 S.W.3d 147, 163 (Tenn. 2001); see also § 39-13-206(c)(1)(A).

We have held that comparative proportionality review "'presumes that the death penalty is not disproportionate to the crime' in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime." Reid, 213 S.W.3d at 820 (quoting State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997)). To determine whether punishment is disproportionate under the facts of this case, we use the precedent-seeking method of comparative proportionality review. This requires us to compare this case with previous cases involving similar defendants and similar crimes. Before we may hold that the death sentence received by the Defendant was disproportionate, we must find that the facts of this case are "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. (quoting State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004)). For comparison, we look to first degree murder cases where "the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Id. (quoting Davis, 141 S.W.3d at 620).

In assessing the similarity between the case under review and previous cases, we have looked to the following details about the offense:

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Id. (quoting Davis, 141 S.W.3d at 620). The Court has also compared the following details about the Defendant: "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Id. (quoting Davis, 141 S.W.3d at 620).

We first consider the circumstances of the offense. The Defendant, an estranged boyfriend, murdered an ex-girlfriend, whose testimony had sent him to prison for rape. While he was in prison, he had confided to other inmates his intentions to harm the victim. The threats the Defendant had made suggest that the murder was a premeditated act of vengeance. That the murder took place shortly after his release from prison buttresses that inference. The proof established that on the night of the murder, the Defendant sought out the victim at her place of employment, murdered her, and disposed of her body. While the means of her death is not entirely clear, the bloody crime scene indicated that there was a violent struggle. The body has never been recovered. Shortly after the murder, the Defendant fled the jurisdiction in a stolen car. After his arrest in Indiana, he sought to escape on more than one instance, even hijacking the extradition van during his return to Tennessee. Handmade weapons were found in his cell.

After breaking off her relationship with the Defendant, the victim had remarried her husband, Donald Ellsworth, by whom she had two children. According to her husband, the victim had accepted her responsibilities as a wife and parent and had become a dependable employee at the Memphis Inn. The victim's mother, husband, and children were impacted by the murder.

The Defendant, having a prior criminal record for violent crimes, was convicted on overwhelmingly persuasive circumstantial evidence. Based on the testimony of two prison inmates, he had planned the murder as an act of revenge. He approached the victim at a time when she was most vulnerable – alone and working after midnight at a hotel. Nothing suggests that the Defendant was mentally, emotionally, or physically impaired at the time of the murder. Although he was not a good student in secondary school, his academic underachievement did not rise to the level of mental disability. To say that the Defendant was cooperative with authorities would be far from accurate. In addition to his escape attempts in Indiana, the Defendant tried to escape the Shelby County Jail. He has portrayed no noticeable signs of remorse for his actions. While the Defendant presented evidence that he had committed to Christianity, ministered to other prisoners, and advocated Bible study, that he was out of prison for such a short time before he committed this murder reveals little hope that he is amenable to rehabilitative efforts.

When conducting a proportionality review, we need not "search for proof that a defendant's death sentence is perfectly symmetrical . . . ." Copeland, 226 S.W.3d at 306 (quoting State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002)). Given the unique circumstances in each case, perfect symmetry is impossible. Our task is to compare similar cases and similar crimes. In several cases, we have upheld the sentence of death where the prior violent felony aggravating circumstance was the sole aggravating circumstance. See Copeland, 226 S.W.3d at 306-07; State v. Cole, 155 S.W.3d 885, 907-09 (Tenn. 2005); State v. Dellinger, 79 S.W.3d 458, 475-77 (Tenn. 2002); State v. McKinney, 74 S.W.3d 291, 314 (Tenn. 2002); State v. Chalmers, 28 S.W.3d 913, 920 (Tenn. 2000); State v. Keough, 18 S.W.3d 175, 184 (Tenn. 2000). We have also upheld the death penalty in several cases that involved the murder of an estranged lover. See State v. Stephenson, 195 S.W.3d 574, 596 (Tenn. 2006); State v. Ivy, 188 S.W.3d 132, 157 (Tenn. 2006); State v. Faulkner, 154 S.W.3d 48, 63 (Tenn. 2005); Stevens, 78 S.W.3d at 822-23; State v. Suttles, 30 S.W.3d 252, 255 (Tenn. 2000); State v. Hall, 8 S.W.3d 593, 595-96 (Tenn. 1999); State v. Porterfield, 746 S.W.2d 441, 443-44 (Tenn. 1988). After examining previous applications of the death penalty and restraints from the use of the death penalty, we find that this case is not "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Davis, 141 S.W.3d at 620 (quoting Bland, 958 S.W.2d at 668). In addition, after reviewing the record, we find no other evidence that the death penalty was imposed in an arbitrary fashion. We hold, therefore, that the Defendant's death sentence was neither disproportionate nor arbitrary.

**Conclusion**

We hold that the exclusion of mitigating evidence was harmless error; the Defendant's waiver of his right to testify was valid; the jury instruction about reasonable doubt did not violate Defendant's due process rights; and the mention of "death row" at Defendant's sentencing hearing

did not result in constitutional error. Finally, we conclude that the Defendant's sentence of death is not disproportionate under the mandatory review criteria of section 39-13-206(c)(1) of the Tennessee Code Annotated.

Accordingly, the judgment of the Court of Criminal Appeals is affirmed. The sentence of death shall be carried out on April 7, 2009, unless otherwise ordered by this Court or other proper authority. It appearing that the Defendant is indigent, the costs of this appeal are taxed to the State.

_____

GARY R. WADE, JUSTICE