Appendix


(Excerpts from the Decision of the Court of Criminal Appeals)


IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 9, 2013 Session

**STATE OF TENNESSEE v. JESSIE DOTSON**


**Appeal from the Criminal Court for Shelby County**
**No. 0807688      James C. Beasley, Jr., Judge**

---

**No. W2011-00815-CCA-R3-DD**

---


ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Kathleen Morris, Nashville, Tennessee, and Marty Brett McAfee, Memphis, Tennessee, for the appellant, Jessie Dotson.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey Dean Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Damon Griffin, Reginald Henderson, and Raymond Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

[Analysis]


### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support his convictions, saying that it is insufficient to establish premeditation and his identity as the perpetrator and that the physical facts rule requires the reversal of his convictions.

Once a jury finds a defendant guilty, his presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). On appeal, the convicted defendant has the burden of demonstrating to this court why the evidence does not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558; Tuggle, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to reweigh or reevaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659. Likewise, we do not replace the jury inferences drawn from the circumstantial evidence with our own inferences. See State v. Elkins, 102 S.w.3d 578, 582 (Tenn. 2003); Reid, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). An intentional act requires that the person have the desire to engage in conduct or cause the result. Id. § 39-11-106(a)(18). A premeditated killing is one "done after the exercise of reflection and judgment." Id. § 39-13-202(d). Premeditation means that

> the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. Bland, 958 S.W.2d at 660; State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was

particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. State v. Lewis, 36 s.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where a defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). Criminal attempt also occurs when the defendant "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

## A. Premeditation

The defendant argues that the evidence at trial established that he committed the crimes while in a state of excitement and passion. In support, he points to his statement to police in which he related how he and Cecil were arguing and that Cecil was waving a gun around when the defendant grabbed his own gun and started shooting. The defendant argues that there is no evidence that he was "sufficiently free of that 'excitement and passion' before the children were assaulted, some of them fatally." We respectfully disagree.

Viewed in the light most favorable to the State, the evidence established that the defendant shot the adult victims multiple times and then repeatedly stabbed and beat the young children, moving from room to room to do so. Although the defendant told police that he first began shooting after Cecil reached for a shotgun, he told his mother that he began shooting after Cecil laid down his gun and that he attacked the children because they had seen him. We note that Sergeant Mullins testified that the shotgun appeared to have been placed in the corner near Cecil, the position in which police discovered it, as part of the staging of the scene.

Moreover, the killings and attempted killings were particularly cruel. Seals was shot in the face and chest, and the gun was close enough to Seals's face that it left stippling on his face when fired. Williams was shot in the head, chest, leg, thigh, and abdomen. Roberson was shot in both thighs and the left knee twice. Cecil had eight gunshot wounds, including to the head, neck, chest, thigh, and foot, and there was material on his face consistent with

a pillow having been placed over his face and a gun fired through the pillow. The children were repeatedly and violently stabbed with knives and beaten with wooden boards, and C.D.1. was left in the bathtub with a knife sticking out of his head. In addition, the defendant talked to some of the victims, rejecting their claims that they loved him and continuing with his violent attacks.

The defendant altered the scene to make it appear as if the murders were drug or gang-related, moved bodies, disposed of or hid kitchen knives and handles, and collected the cartridge casings. He escaped on a bicycle and hid it in his girlfriend's shed. Instead of attempting to render aid or summon help, he went to a restaurant for dinner the next night and reported to work on the Monday following the attacks, without telling anyone about the crimes. He also lied to his family about the last time he had seen Cecil. This evidence was more than sufficient to establish the element of premeditation in the defendant's convictions for first degree murder and attempted first degree murder.

## B. Physical Facts Rule

The defendant also contends that the evidence against him was largely based on the testimony of C.D.1, portions of which were negated by the "physical facts rule," requiring reversal of his convictions. We, again, respectfully disagree.

The physical facts rule is "'the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded.'" State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (quoting State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993)). When a witness's testimony "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it." Id. (quotation omitted). For the physical facts rule to apply, the testimony "must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. at 680. For example, testimony that a witness "saw the sun set in the east" could be disregarded. Id.

The physical facts rule, however, is a power "that should be used sparingly." Hornsby, 858 S.W.2d at 895. When the testimony "is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." Id. The determination of whether there are inconsistencies in testimony, the reconciliation of conflicts in testimony, and the determination of how this might affect a witness's credibility, are within the province of the jury. Id. "[T]he improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." Id. at 896 (quotations

omitted).  The physical facts rule may not be invoked "where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects."  Allen, 259 S.W.3d at 680 (quotations omitted).

The defendant asserts that although C.D.1 testified that he saw the defendant attacking his siblings and speaking to Williams while C.D.1 was in the bathtub, "it would have been impossible to see inside the bedroom from his vantage point in the tub."  The defendant also asserts that C.D.1's testimony that he was stabbed in the neck while lying on the bed in his sister's room was contradicted by the lack of his blood on that bed.

C.D.1 did not, however, testify that the defendant "stabbed" him in the neck, but instead that the defendant "cut" his neck.  We note that Dr. Muhlbauer confirmed that C.D.1 had a superficial laceration across his neck and that no evidence was presented regarding what amount of blood, if any, such a superficial laceration would have produced.  Regardless, we cannot conclude that C.D.1's testimony regarding the attack violated the physical facts rule.  As this court has previously noted, "the fact that a witness testifies and that testimony ends up being inconsistent with other testimony raised at trial, . . . even if [it is] scientific testimony, does not make it inadmissible testimony."  Lemar Brooks v. State, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *16 (Tenn. Crim. App. Jan. 11, 2012), perm. app. denied (Tenn. May 16, 2012) (quotations omitted).  Throughout his testimony, C.D.1 identified the defendant as the perpetrator.  The jury could have resolved any conflicts and discrepancies in his testimony by attributing them to his youth, his head injury, or the extreme trauma he must have experienced by witnessing and experiencing the horrific attacks against him and his family members.  We conclude, therefore, that this issue is without merit.

## C.  Identity

Lastly, the defendant contends that the evidence is insufficient to establish his identity as the perpetrator.  Specifically, he argues that his statement was inconsistent with the physical evidence and that the forensic evidence excluded him as the perpetrator.  However, he confessed that he was the perpetrator, both in a statement to police and during his conversation with his mother.  In addition, two of the child victims identified him as their attacker.  By convicting the defendant of the indicted crimes, the jury obviously rejected the defendant's trial testimony in which he claimed to have been hiding under the bed while the murders and attempted murders were perpetrated by others.  We conclude, therefore, that the evidence is more than sufficient to sustain the defendant's convictions.

* * *

## VI.  Trial Court's Treatment of Defense Counsel

The defendant next contends that the trial court's reprimand of defense counsel in open court prejudiced his right to a fair trial.  The exchange about which the defendant complains occurred after defense counsel first questioned Sergeant Mullins about the presence at the crime scene and during the defendant's police interview of a camera crew from the television show, *The First 48*, and then asked Sergeant Mullins the following question about a cameraman who was recording the trial:

> Q.     . . . That guy is from A and E, isn't he, *The First 48*?  We're still continuing the story, aren't we?
>
> A.     As far as I know, yes, sir.
>
> Q.     We're filming the rest of the show; right?

Before Sergeant Mullins answered the question, the trial court interrupted, stating:

> THE COURT:  [F]or the record, the Supreme Court of the State of Tennessee has authorized cameras in the courtroom.  This Court allows one camera in the courtroom and all media outlets feed off of the one camera.  That camera and the TV station associated with that is the lead camera that's in the courtroom.  Every media outlet and every channel is peeling off of one camera.  That is one that has been authorized by the Supreme Court to be here.
>
> [DEFENSE COUNSEL]:  I understand.
>
> THE COURT:  This Court is not authorizing a television show or to be part of a television show.  They are following the rules that the Supreme Court says.  So let's make sure the record is clear that this is not a TV show and this is not being produced as a TV show and it's not being edited as a TV show.  This is a trial.
>
> [DEFENSE COUNSEL]:  Can I ask him who the producer that's running the camera works for?
>
> THE COURT:  No, sir.
>
> [PROSECUTOR]:  I'm going to object to relevance.

THE COURT: That camera is in this courtroom and you know that camera is in this courtroom under the rules of the Supreme Court of Tennessee. They are one of a party of media outlets that are using that feed. So let's don't talk about this being part of a TV show. You want to ask questions, let's ask relevant questions.

[DEFENSE COUNSEL]: I am asking questions about this.

THE COURT: This is not apart [sic] of a television show . . . . Let's move on to something that's relevant.

Defense counsel continued by questioning Sergeant Mullins about the presence of a camera and the crew from *The First 48* during the time the defendant was interviewed by police. The trial court again interrupted, informing defense counsel that it believed Sergeant Mullins had previously answered that question. The State requested a bench conference, and the trial court denied the request:

That he was not present when that interview was conducted so let's move into areas that he's aware of, okay. I've allowed this to go for a long way, and I know where you're going and I understand why you're going there. He's already testified he wasn't present when that interview was conducted. He doesn't know who was in there.

During a subsequent jury-out hearing, co-counsel objected to the trial court's "calling down" defense counsel when he was questioning a witness. The trial court explained that defense counsel had accused the court of being part of a television show. The court stated, "And that's when I said enough. This is not part of a TV show. This is a court of law." The trial court agreed that in the future, it would not "call [defense counsel] down" in the jury's presence but would call them to the bench instead. The court thereafter apologized to defense counsel "for losing [its] temper." When the jury returned, the trial court then offered the following apology to the jury:

All right. Ladies and gentlemen, first, let me apologize to you for losing my temper. I've already apologized to the lawyers. You need to understand that – and I know you do, this is an adversarial proceeding. But within that adversarial proceeding there [are] certain rules of decorum that we all must operate under, me included. I've worked with these lawyers for many years.

Sometimes I lose my temper and it's inappropriate. I should not do that. I should not do it in the manner in which I sometimes lose my temper. So I've apologized to them. I apologize to you. I will say to you, you cannot, should not, nor would it be proper for you to in any way hold [the defendant] or anybody else responsible for my lack of being able to maintain my own cool. So I say that to you with all d[ue] respect. I hope you accept my apology.

"[A]ll litigants are entitled to the 'cold neutrality of an impartial court' and have a right to have their cases heard by fair and impartial judges." Wright v. Pate, 117 S.W.3d 774, 778 (Tenn. Ct. App. 2002) (quoting Kinard v. Kinard, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998)). Cannon 3(A) of the Code of Judicial Conduct provides that a trial judge should be "patient, dignified, and courteous to the litigants, jurors, witnesses and lawyers" during the course of a trial, and instructs the trial judge to perform his or her judicial duties without bias or prejudice. Tenn. Sup. Ct. R. 10.[1] While the trial judge is extended broad discretion in controlling the course and conduct of the trial, the trial judge must refrain from expressing "any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

It is apparent that defense counsel's cross-examination of Sergeant Mullins about the presence of the camera crew and the fact that the trial was being filmed for possible use in a future television show came across to the trial court as an attack on the integrity and formality of the trial process, which led to the court's reprimand to counsel. While we can understand and sympathize with the trial court's frustration, we agree that the court should have avoided reprimanding defense counsel in the presence of the jury.

We do not, however, believe that the trial court's remarks, when viewed in the context of the entire trial, deprived the defendant of his constitutional right to a fair trial. The remarks constituted a brief portion of a multi-week trial; the trial court apologized to both defense counsel and the jury for the remarks; and the trial court appropriately instructed the jury that it was not to consider its comments against the defendant. We, therefore, conclude that, considering the record in its entirety, the error was harmless beyond a reasonable doubt. See State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *42-43 (Tenn. Crim. App. Sept. 22, 1997), perm. app. denied (Tenn. Nov. 9, 1998) (holding that while the trial court's remark was improper, the error was "harmless beyond a reasonable doubt").

---

[1] The Code of Judicial Conduct was revised, effective July 1, 2012. Because the trial occurred prior to the effective date of the revisions, we refer to the Code that was in effect at the time of the trial.

The defendant also complains that his right to a fair trial was violated by the fact that the trial court continued to interject during defense counsel's cross-examination of Sergeant Mullins, instructing defense counsel to repeat or rephrase questions and refusing to allow defense counsel to ask certain questions. The record, however, demonstrates that the trial court merely asked defense counsel to repeat or rephrase questions that were unclear and refused to allow counsel to repeatedly ask the same questions. By doing so, the trial court was fulfilling its duty to ensure that the proceedings "move[d] along in an orderly and systematical manner." State v. Evans, 838 S.W.2d 185, 195 (Tenn. 1992). We conclude, therefore, that the defendant is not entitled to relief regarding this issue.

\* \* \*

## VIII. Admission of Photographs

The defendant contends that the trial court erred in denying his motion to prohibit the display of photographs of the victims after death. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-77 (Tenn. 2000); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). As our supreme court stated in Carruthers, the modern trend is to vest more discretion in the trial court's rulings on admissibility. 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term "unfair prejudice" has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51.

In Banks, our supreme court provided trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. Id. at 951.

The defendant argues that the trial court erred in admitting photographs of the victims' facial injuries and crime scene photographs of the three child victims. We note, however, that the defendant raised no objections to the admission of the photographs at trial and at a pretrial hearing objected only to six photographs that depicted the children's injuries, which were taken at the hospital. At the conclusion of the hearing, the trial court ruled that five of the six photographs were relevant and admissible to show the extent and nature of the injuries in order for the State to prove premeditation. The court reserved its ruling on the sixth photograph in order for the State to determine whether it depicted a bloody bandage on a victim's head, or a portion of the child's scalp, stating that if it were a bandage, it would admit the photograph. The defendant has, thus, waived review of this issue.

Even if not waived, we would conclude that the trial court did not err in admitting the photographs. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. See Banks, 564 S.W.2d at 950-51. The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner and the treating physician regarding the victims' injuries and to support the aggravating circumstances alleged by the State. See, generally, State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix). We conclude, therefore, that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in admitting them.

## IX. Denial of Motion to Provide DNA Analysis

The defendant next contends that the trial court erred in denying his second amended motion to provide DNA analysis for all those who were in contact with the crime scene. The defendant filed his initial motion on May 13, 2010, stating that the purpose of the request was to eliminate law enforcement, medical, and other personnel who were present at the crime scene from physical evidence at the scene that did not match the defendant or the victims. During a hearing, defense counsel informed the trial court that the motion was filed in response to a report from the FBI crime laboratory which stated that two Caucasian or Asian Mongoloid hairs that were discovered mixed in the blood on the buttocks and thigh region of Roberson's body could not be identified as belonging to the defendant or the victims. The trial court ordered the State to determine those of Caucasian or Asian Mongoloid descent who had contact with the victim's body in investigating the crime scene.

During a subsequent hearing, the State informed the trial court that five individuals had direct contact with the victim's body: the medical examiner, the medical examiner's assistant, an emergency response officer, and two people from the private corpse removal service that the medical examiner's office used to transport the victims' bodies. The trial court denied the defendant's motion to require those five people to provide DNA samples for

comparison with the unidentified hairs, observing that it was unaware of any authority that would permit it to compel private citizens who were not suspected of a crime to provide DNA samples to the court for testing by a criminal defendant. The court also noted that even if DNA testing were to exclude those five individuals as contributors, such evidence would not, alone, exculpate the defendant.

The trial court further noted that the defendant could request that those five people voluntarily provide a DNA sample and that defense counsel could, during trial: (1) question the State's experts regarding the availability of DNA testing and their decision not to perform such tests in order to eliminate investigators and medical personnel as contributors of the hairs; (2) question law enforcement and medical witnesses regarding the protocols they followed in preserving the evidence and avoiding scene contamination; and (3) argue that the hairs possibly belonged to an unknown perpetrator or an additional perpetrator. The defendant also could employ his own expert to review and potentially refute the State's findings upon a showing of particularized need for funding. Finally, the trial court prohibited the State from unfairly benefitting from its ruling by either claiming or inferring that the unidentified hairs conclusively belonged to one of those five individuals, or other individuals, who had entered the crime scene. The only inference that the trial court allowed the State to draw was that the hairs remained unidentified and could have been left by someone other than an unknown perpetrator.

Shortly thereafter, the defendant filed amended motions in which he argued that the testing was necessary in order to protect his rights to confront witnesses, compulsory process of the law, and present a third party defense. The defendant asserted that the trial court could enter a protective order prohibiting disclosure of the testing absent court order. The trial court, however, once again denied the request.

The defendant acknowledges there is no Tennessee precedent for court-ordered DNA testing of law enforcement and medical personnel. See, e.g., Bartlett v. Hamwi, 626 So. 2d 1040, 1042-43 (Fla. Dist. Ct. App. 1993) (upholding the trial court's denial of the defendant's motion to obtain a hair sample from a prosecution witness based upon the absence of a rule or statute authorizing such discovery, as well as a consideration of the witness's constitutional rights); State v. McKinney, 730 N.W.2d 74, 89-90 (Neb. 2007) (applying the analysis in Bartlett in upholding the denial of the defendant's motion to obtain DNA samples from witnesses). The defendant argues, however, that such DNA testing is similar to law enforcement officers requesting "elimination fingerprints" when investigating a crime. We note, however, that in State v. Dailey, 273 S.W.3d 94, 97 (Tenn. 2009), the case upon which the defendant relies, the trial court did not order the fingerprinting, but individuals were instead asked to voluntarily provide elimination fingerprints. Id.

Moreover, the withdrawal of blood for testing "infringes an expectation of privacy" and is subject to the constraints of the Fourth Amendment. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006). Although we recognize that it is possible to "extract DNA by applying a sticky patch to the skin on an individual's forearm for a moment to acquire epidermal cells without puncturing the skin surface," Scarborough, 201 S.W.3d at 619 (quotations omitted), DNA analysis performed after the collection of a biological specimen "is a separate and distinct search which 'is potentially a far greater intrusion than the initial extraction of DNA, since the state analyzes DNA for information and maintains DNA records indefinitely.'" Id. (quoting Nicholas v. Goord, 430 F.3d 652, 670 (2d Cir. 2005)).

"[A] witness, who is not a suspect, defendant or victim, should have no *less* protection against bodily intrusion than defendants or suspects in criminal cases." Bartlett, 626 So. 2d at 1042 (footnote omitted). While the present case involves the defendant's request for evidence, a witness continues to be protected under the Fourth Amendment and the constitutional rights to privacy guaranteed by the United States Constitution. See id. at 1042-43. Thus, we must balance the constitutional rights of those third parties from whom the defendant sought to compel DNA samples against any rights that the defendant might have in presenting his defense. See McKinney, 730 N.W.2d at 90. In so doing, we agree with the trial court's observation that the exclusion of the personnel who came into contact with Roberson's body as the contributors of the hairs would not have exculpated the defendant, especially given the testimony at trial about the amount of traffic at the home during the five months in which Cecil lived there. After balancing these competing rights, we conclude that "[t]he circumstances presented here do not constitute a 'rare instance' where justice may require an invasion of a witness' privacy rights or an invasion of [a third party's] Fourth Amendment rights." Bartlett, 626 So. 2d at 1043.

### X. Denial of Motion for Production of Statements of Those Not Called as Witnesses

The defendant next contends that the trial court erred in denying his motion for production of statements of those not called as witnesses by the State and that the State was required to disclose those statements pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is

"material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). "Materiality" has been further explained as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worth of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

First, the defendant has failed to establish that the State suppressed the information or that the information was favorable to the defense. During the pretrial hearing on the motion, defense counsel acknowledged that the State provided open-file discovery. The prosecutor also commented that "anything that's in the possession of the Memphis Police Department has to be turned over to the Defense." The defendant identifies testimony from various officers at trial that they received numerous tips regarding problems that Cecil was having with a gang and money that he allegedly took. The defendant, however, was able to present evidence through cross-examination of the State's witnesses, as well as through witnesses that he called to testify, that Cecil was in trouble with the Gangster Disciples for committing a gang violation and that Cecil owed $300,000 to "the mob." The defendant does not state what additional information he alleges that the State failed to disclose.

Moreover, the defendant has failed to show that the information was material. Evidence of the defendant's guilt was overwhelming. The jury heard and rejected evidence suggesting that Cecil might have been killed due to his debt with "the mob," in retaliation for the shooting death of a member of a rival gang, or as the result of committing a violation against one of his fellow gang members. The defendant fails to establish a reasonable probability that the result of the proceedings would have been different had such additional evidence been disclosed to the defense. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## XI. Improper Jury Instructions

The defendant challenges as prejudicially improper multiple jury instructions given during the guilt phase of his trial. Because the defendant did not object to the instructions at trial or raise the issues in his motion for new trial, the issues are waived, and our review is limited to plain error. Faulkner, 154 S.W.3d at 58; see also Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

We must review jury instructions in their entirety, and we may not examine phrases in isolation. State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008). In determining whether a defendant is harmed by an ambiguous, erroneous instruction, we must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Id. (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The significant question is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id. (quotations omitted). An ambiguous term does not necessarily constitute error. Id.

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. (quotations omitted).

The defendant first asserts that the trial court's instruction defining "reasonable doubt" at the close of proof in the guilt phase improperly reduced the State's burden of proof. The trial court instructed the jury as follows:

> The law presumes that the defendant is innocent of the charges against him, therefore, you as the jury, must enter upon this investigation with the presumption that the defendant is not guilty of any crime and this presumption stands as a witness for him unless it is rebutted and overturned by competent and credible proof. It is, therefore, incumbent upon the State, before you can convict the defendant, to establish to your satisfaction, beyond a reasonable doubt, that the crime charged in the indictment has been committed; that the same was committed in Shelby County, Tennessee, before the indictment was returned and that the defendant on trial committed the crime in such a manner that would make him guilty under the law as it has been defined and explained to you.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but it remains on the State throughout the trial of the case. The defendant is not required to prove his innocence. The State must have proven beyond a reasonable doubt all of the elements of the crime charged and that it was committed before the finding and returning of the indictment in this case.

A reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof requisite to constitute the offense.

The defendant takes issue with the statement, "Reasonable doubt does not mean a doubt that may arise from possibility." This issue was addressed by the Tennessee Supreme Court in Rimmer, 250 S.W.3d at 30-31. The court stated that a fair interpretation of the phrase is that "reasonable doubt does not mean a doubt that may arise from mere possibility no matter how improbable." Id. at 31. The court concluded that the jury instruction did not result in the denial of due process and that there was not a reasonable likelihood that the jury applied the burden of proof in an unconstitutional way. Id.

The defendant attempts to distinguish Rimmer from the present case because the instruction in Rimmer was given in the penalty phase, rather than the guilt phase as in the present case. The defendant does not cite any authority holding that the meaning of "reasonable doubt" differs between the guilt and penalty phases. Under the circumstances of this case, we cannot conclude that the jury was reasonably likely to have applied the burden of proof in an unconstitutional way. While further use of this instruction is discouraged, see id., the instruction is not unconstitutional.

The defendant also takes issue with the trial court's instruction during the guilt phase that "[t]here are nine counts in this indictment. You will have a packet of *sentencing* forms for each count as to each victim." (emphasis added). According to the defendant, the instruction indicated that "guilt was a foregone conclusion and the jury was charged with sentencing." Given that the trial court repeatedly instructed the jury that the defendant was innocent until proven guilty, we cannot conclude that the instruction affected a substantial right as to rise to the level of plain error.

-15-

The defendant next argues that the trial court improperly combined each of the six counts of first degree murder and each of the three counts of attempted first degree murder into one instruction. According to the defendant, the instruction suggested that all of the murder counts should have one verdict and all of the attempted murder counts should have one verdict. The trial court instructed the jury that it was to return a verdict on each of the nine counts, and the jury did as instructed. The defendant is not entitled to relief on this issue.

The defendant also complains about the following statement the trial court made after instructing the jury regarding the definitions of "intentionally," "knowingly," "recklessly," and "criminal negligence":

> These definitions apply to the offenses of Murder in the First Degree, Murder in the Second Degree, Voluntary Manslaughter, Reckless Homicide and Criminally Negligent Homicide. They also apply to the offenses of Attempted Murder in the First Degree, Attempted Murder in the Second Degree and Attempted Voluntary Manslaughter.

The defendant argues that through this instruction, the jury was told to apply the mental states of "recklessly" and "negligently" to the first degree murder charge. The trial court, however, then defined each of the offenses, which included the mental state applicable for each offense. The trial court specifically instructed the jury that in order to convict the defendant of premeditated first degree murder, it must find that the defendant acted "intentionally." Because the trial court's instruction for first degree and attempted first degree murder specifically limited their applications to an intentional mental state, we cannot conclude that the jury was told to apply and that the jury did apply the mental states of "recklessly" or "negligently" to the first degree and attempted first degree murder charges.

The defendant next asserts that the trial court's instruction to "[t]ake the case, consider all of the facts and circumstances fairly and impartially and return to the court with the verdict that TRUTH dictates and JUSTICE demands" informed the jury that if it believed that the defendant committed the offenses as alleged, it could render a verdict of guilt regardless of whether the State proved its allegations beyond a reasonable doubt. The trial court, however, repeatedly instructed the jury that the defendant was innocent until proven guilty. Thus, we cannot conclude that the instruction affected a substantial right of the defendant such as to rise to the level of plain error.

## XII. Failure to Instruct Facilitation as a Lesser-Included Offense

The defendant next contends that the trial court erred in failing to instruct the jury on facilitation as a lesser-included offense of premeditated first degree murder and attempted first degree murder. Whether a particular instruction regarding a lesser-included offense should have been given is a mixed question of law and fact. State v. Hatfield, 130 S.W.3d 40, 41 (Tenn. 2004). We review mixed questions of law and fact *de novo* with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

Facilitation of the charged offense is a lesser-included offense under the test established in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). The issue is whether the evidence presented at trial was sufficient to support an instruction for facilitation. A two-step analysis is necessary to determine if an instruction on a lesser-included offense is supported by the evidence. First, we must determine if any evidence exists that "reasonable minds could accept as to the lesser-included offense." State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002). Second, we must determine "if the evidence, when viewed liberally in the light most favorable to the existence of a lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense." Id.

The theory presented by the State at trial was that the defendant acted alone in shooting the adults and stabbing and beating the children. The theory presented by the defense was that someone else attacked the victims while the defendant hid in a bedroom under the bed. Neither of these theories support a facilitation instruction. We conclude, therefore, that the trial court properly declined to instruct the jury on facilitation as a lesser-included offense of premeditated first degree murder and attempted first degree murder.

## XIII. Denial of Motion to Strike Aggravating Circumstances

The defendant next contends that the trial court erred in denying his motion to strike the (i)(3) and (i)(12) aggravating circumstances as duplicitous. The (i)(3) aggravating circumstance provides that the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." Tenn. Code Ann. § 39-13-204(i)(3). The (i)(12) aggravating circumstance provides that the defendant "committed 'mass murder,' which is defined as the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period." Id. at (i)(12). The defendant argues that these aggravating circumstances are duplicitous "[i]nasmuch as the risk of death factor in this case is inclusive in the mass murder factor."

Our supreme court has, however, already rejected the claim that the (i)(3) and (i)(12) aggravating circumstances are duplicitous, finding that each of these aggravating circumstances relies upon different policy justifications for rendering a defendant eligible for the death penalty. State v. Jordan, 325 S.W.3d 1, 74 (Tenn. 2010). The court recognized that the fact that "the same conduct may satisfy certain elements of different aggravating circumstances does not contaminate the jury's sentencing process, or invalidate its weighing process." Id. The court, thus, declined to hold as unconstitutional the use of the same evidence to satisfy elements of different but valid aggravating circumstances. Id. The defendant, therefore, is not entitled to relief on this issue.

## XIV. Denial of Motion for Probable Cause Finding that Aggravating Circumstances Existed

The defendant next contends that the decision to charge a capital offense must be made by the grand jury and not the prosecutor. He further argues that the failure to allege any aggravating circumstances in the indictment violated his Fifth Amendment right to an indictment by grand jury. The Tennessee Supreme Court has, however, rejected this argument. See State v. Thomas, 158 S.W.3d 361, 406 (Tenn. 2005). The defendant is not, therefore, entitled to relief on the basis of this issue.

## XV. Denial of Motion for Disclosure of Information Regarding Proportionality Review

The defendant next contends that the trial court erred in denying his motion for disclosure of information regarding proportionality review so that he may challenge the constitutionality of comparative proportionality review. Our supreme court has, however, rejected other similar challenges to the meaningfulness of comparative proportionality review. See, e.g., State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994). Moreover, as fully discussed below, we conclude that the defendant's death sentences are proportionate to the penalty imposed in similar cases. This issue is, therefore, without merit.

## XVI. Admission of Victim Impact Evidence

The defendant next contends that the trial court erred in admitting victim impact evidence in the penalty phase of the trial. The defendant does not identify specific testimony that he claims was erroneously admitted, but instead urges this court to adopt Justice Stevens' dissent in Payne v. Tennessee, 501 U.S. 808, 859-60 (1991), in which he opines that victim impact evidence is improper in any capital case. Our supreme court has, however, recognized the admissibility of victim impact evidence during the penalty phase of a capital

case even after Justice Stevens' dissent in Payne. See State v. Nesbitt, 978 S.W.2d 872, 899-90 (Tenn. 1998) (finding no federal or state constitutional barriers to victim impact evidence at capital sentencing). This issue is, therefore, without merit.

## XVII. Denial of Motion to Argue Last

The defendant next contends that the trial court erred in denying his motion to argue last during the penalty phase. Tennessee Code Annotated section 39-13-204(d) provides that during the penalty phase, "the state shall be allowed to make a closing argument to the jury; and then the attorney for the defendant shall also be allowed such argument, with the state having the right of closing." The practice of allowing the State to argue last at sentencing has been held to be constitutional. See State v. Melson, 638 S.W.2d 342, 368 (Tenn. 1982). This issue is without merit.

## XVIII. Prosecutorial Misconduct

The defendant contends that the State committed prosecutorial misconduct during the rebuttal closing arguments in both the guilt and penalty phases of the trial. The defendant did not object to all the portions of the State's argument at trial that he claims are improper or raise the issue of prosecutorial misconduct in his motion for new trial. Therefore, the issue is waived, and our review is limited to plain error. Faulkner, 154 S.W.3d at 58; see also Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

Closing arguments are a "valuable privilege" and should not be unduly restricted. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Id. We have explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

The generally recognized areas of prosecutorial misconduct in closing arguments occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence of the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those that are matters of common public knowledge. Id. at 6.

The defendant first argues that the State denigrated the defense by referring to alternate theories as "smoke and mirrors," "ridiculous," and "insane" and by referring to defense counsel as a "tricky lawyer." A review of the record reveals that the prosecutor used the phrase "smoke and mirrors" to refer to the defense's attempts to divert attention from the issues and not as a suggestion that evidence was fabricated by the defense. The prosecutor used the phrase "ridiculous" to rebut the defense's argument that the murders were committed by gang members who then remained at the crime scene to rearrange the scene, and to rebut defense counsel's argument that the defendant's behavior following the murders could not be explained. The prosecutor described defense counsel's attempts to use evidence that the State believed to be irrelevant to argue reasonable doubt as "ridiculous" and "insane." When viewed in their context, we cannot conclude that the prosecutor's comments violated a clear rule of law. Moreover, even if the arguments were improper, the error was harmless in light of the strong evidence of guilt. Thus, the defendant also has failed to establish that the issue involves a substantial right. Accordingly, the issue does not rise to the level of plain error.

The defendant also complains about the prosecutor's rebuttal argument in the guilt phase of the trial that the jury should not discredit the testimony of two of the surviving children "because of some tricky lawyer or expert." When viewed in its context, we cannot conclude that the prosecutor's comment was an attack on defense counsel's credibility. Rather, the comment was an attempt by the prosecutor to persuade the jurors to focus on their own views of the credibility of these witnesses and the evidence.

The defendant also complains of the following statement by the prosecutor:

And you want to talk about this tape and the five hours? Sure. The defense has a golden nugget because *The First 48* when they were editing their television show only played certain parts on TV and the rest they destroyed the raw footage. That wasn't in the Memphis Police Department's control. Remember that please because they're getting blamed for it.

So now [the defendant] can say whatever he wants. Oh, that five hours that you don't get to see, this is what I was doing.

At the conclusion of the prosecutor's argument, defense counsel objected, asserting that evidence was never presented that employees from *The First 48* destroyed the tape recording of the officers' interrogation of the defendant. The defendant, however, does not make this argument on appeal. Rather, the defendant argues that the prosecutor interjected his own opinion by arguing that the defendant can "say whatever he wants." Based upon our review of the record, we conclude that the prosecutor was not interjecting his own opinion

but was attacking the credibility of the defendant's testimony based upon the evidence presented at trial and the inferences drawn from the evidence.

The defendant also argues that the prosecutor testified when he stated the following:

> Prosecution witnesses are coached. That's another thing they're going to throw out at you. What proof do they have? Did they put me on the stand? Did they ask me hey, did you coach him last night? Because I would have given you an answer. These children wanted to come in here and tell you what happened to them the best they could.

We agree that the prosecutor's comment suggesting that defense counsel could have and should have called him to testify was improper. While the prosecutor's argument that the children who testified were not coached was not artfully made, we cannot conclude that the prosecutor's statement that "[t]hese children wanted to come in here and tell you want happened to them the best they could" constituted testimony from the prosecutor. After making the statement, the prosecutor discussed the trauma that the children suffered and the difficulties that the children experienced recalling details. Thus, the statement was consistent with the evidence presented at trial. The prosecutor's argument does not rise to the level of plain error.

The defendant also contends that the prosecutor injected his own opinion during closing arguments in the guilt phase by telling the jury that the defendant's testimony was "not believable" and that the defendant was "lying." The prosecutor did not offer his opinion. Rather, he argued that based on the evidence, the defendant's testimony was not believable and that he was lying. This argument was proper.

According to the defendant, the prosecutor encouraged the jury to experience the victims' fear during rebuttal argument in the penalty phase. The prosecutor's references to the fear that the victims must have felt related to the "nature and circumstances" of the offenses and, therefore, were proper. See State v. Odom, 336 S.W.3d 541, 562 (Tenn. 2011).

The defendant contends that the prosecutor misrepresented the weighing procedure for aggravating and mitigating circumstances. While true, the prosecutor later corrected himself and stated the appropriate burden of proof. The trial court also instructed the jury on the correct burden of proof. This issue is, therefore, without merit.

Finally, the defendant complains of the prosecutor's comment that the defendant "stamped them out like they were insects in a two-hour period," as well as the following argument:

What's going to stop him?  You.  You.  And how are you going to do
it?  With the law, with the law.  We're not asking anything of you but to follow
the law.  And the law does give you your verdict in this case, shall be death.

The defendant argues that by such language, the prosecutor urged the jurors to exact their
personal retribution.  When viewed in the context of the prosecutor's argument, these
comments were not an effort to urge the jurors to exact their personal retribution but were
an attempt to persuade the jury to impose the punishment afforded by the law.  The
prosecutor did not violate a clear rule of law in making such an argument.  Thus, the issue
does not rise to the level of plain error, and the defendant is not entitled to relief.

## XIX.  Allowing Death Verdicts to Stand

The defendant next challenges the constitutionality of Tennessee's murder and death
penalty statutes, arguing that the death penalty statute is unconstitutional because it limits the
jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if
aggravating factors outweigh mitigating factors.  The defendant also asserts that the statute
does not require the jury to make the ultimate determination that the appropriate punishment
is death, in violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United
States Constitution.  The Tennessee Supreme Court has, however, rejected this argument.
See State v. Smith, 857 S.W.2d 1, 22 (Tenn. 1993); State v. Boyd, 797 S.W.2d 589, 596
(Tenn. 1990).

The defendant next argues that Tennessee's murder and death penalty statutes violate
the equal protection clauses of the state and federal constitutions because they do not provide
uniform standards for qualifying jurors for service on capital cases. This challenge, however,
was rejected in State v. Reid, 91 S.W.3d 247, 313 (Tenn. 2002).

The defendant also argues that the statutes are unconstitutional because they invest
prosecutors with unlimited discretion to seek the death penalty. This argument has also been
rejected.  See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995).

The defendant next argues that the "heinous, atrocious, or cruel" aggravating factor
is vague and overbroad.  This argument likewise has been rejected.  See State v.
Middlebrooks, 995 S.W.2d 550, 556-57 (Tenn. 1999).

According to the defendant, the language in the "mass murder" aggravating
circumstance is too reminiscent of terrorism.  The defendant does not cite to any authority
in support of his claim.  "Mass murder" is defined as "the murder of three (3) or more
persons, whether committed during a single criminal episode or at different times within a

forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12). We conclude that the plain language of this statute does not imply terrorism. Moreover, the Tennessee Supreme Court has upheld the application of this aggravating circumstance in other capital cases. See, e.g., Jordan, 325 S.W.3d at 70. The defendant is not entitled to relief regarding this issue.

The defendant next contends that Tennessee's death penalty statute is unconstitutional because it permitted evidence of his prior conviction for second degree murder. Tennessee Code Annotated section 39-13-204, which permits the admission of the conviction and the facts and circumstances underlying the conviction, has been upheld as constitutional. See Reid, 91 S.W.3d at 312.

The defendant contends that Tennessee's death penalty statute violates state and federal constitutions because it does not give the jury unlimited discretion not to impose the death penalty. This argument is similar to the argument that the defendant made above and has been rejected. See Smith, 857 S.W.2d at 22; Boyd, 797 S.W.2d at 596. The defendant also contends that the death penalty is capriciously and arbitrarily imposed. This argument likewise has been rejected. See Reid, 91 S.W.3d at 312-13.

\* \* \*

## XXI.  Sentencing for Non-Capital Offenses

The defendant challenges the trial court's order imposing forty-year consecutive sentences for each of the three attempted first degree murder convictions and also challenges the reasonableness of the sentencing hearing.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement factors advisory only. See Tenn. Code Ann. §§ 40-35-114, 40-35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must consider them. Tenn. Code Ann. § 40-35-210(c). Although the application of the factors is advisory, the court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." Tenn. Code Ann. § 40-35-210(b)(5). The trial court also must place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. Id. (citations omitted).

When a defendant challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor, the error will not remove the presumption of reasonableness from its sentencing determination. Id. at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under such circumstances, we may not disturb the sentence even if we had preferred a different result. See Carter, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In sentencing the defendant, the trial court considered the purposes of sentencing set forth in Tennessee Code Annotated sections 40-35-102 and 40-35-103. The court found that based upon the defendant's prior conviction for second degree murder, he was a Range II, multiple offender.

The trial court applied seven enhancement factors to each of the three convictions for attempted first degree murder. The court found the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(2) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

(3) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(4) The personal injuries inflicted upon, or the amount of damage to property, sustained by or taken from the victim was particularly great;

(5) The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense;

(6) The felony resulted in death or serious bodily injury or involved the threat of death of serious bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury; and

(7) During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim.

Tenn. Code Ann. § 40-35-114(1), (4), (5), (6), (9), (11), (12). The trial court placed little weight on the prior criminal history enhancement factor and no weight on the serious bodily injury during the commission of a felony enhancement factor. See id. (1), (12). With regard to the defendant's conviction for the attempted first degree murder of C.D.1, the trial court placed little weight on the particularly vulnerable victim enhancement factor. See id. (4). The trial court found that no mitigating factors applied. The court sentenced the defendant to forty years for each conviction of attempted first degree murder. The court also found that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-114(b)(5). The court ordered the defendant to serve his three convictions for attempted first degree murder consecutively to each other and to his death sentences.

### A. Reasonableness of Sentencing Hearing

The defendant challenges the reasonableness of the sentencing hearing and argues that the trial court did not allow defense counsel to respond to the State's argument before imposing the sentences. The trial court asked defense counsel whether they wished to

present any evidence and whether the defendant wished to make a statement. Defense counsel declined both offers. Defense counsel did not object or request that they be allowed to respond to the State's argument. This issue is without merit.

## B. Reasonableness of Sentences

The defendant contends that the forty-year sentences were unreasonable. The defendant does not challenge the trial court's application of the seven enhancement factors. Rather, the defendant contends that the trial court erred in not considering evidence of non-statutory mitigating factors presented during the penalty phase.

As a Range II, multiple offender convicted of a Class A felony, the defendant was subject to a sentence of twenty-five to forty years. See Tenn. Code Ann. §§ 39-11-117, 40-35-112(b)(1). The trial court imposed the maximum sentence within the range. Upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Bise, 380 S.W.3d 707. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision. The trial court did not abuse its discretion in imposing the maximum sentence within the applicable range.

## C. Consecutive Sentences

The defendant asserts that the trial court erred in ordering that he serve his sentences for attempted first degree murder consecutively to each other and to his death sentences. In ordering consecutive sentences, the trial court found that the defendant is a "dangerous offender whose behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). "[W]hen a trial court uses the 'dangerous offender' factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing." State v. Alder, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001).

-26-

The trial court found that the circumstances of the offenses were "aggravated," stating, "I don't know of anything that I can think of is more aggravated than this." The court further found that consecutive sentences were reasonably related to the severity of the offenses and were necessary to protect the public from the defendant and his "reserve to criminal activity." The record fully supports these findings. We conclude, therefore, that the trial court properly imposed consecutive sentences based on its classification of the defendant as a dangerous offender.

## XXII. Cumulative Error

The defendant asserts that the cumulative effect of the errors at trial rendered both the guilt, penalty, and sentencing phases of his trial fundamentally unfair. As explained above, any errors, when considered both individually and cumulatively, did not result in prejudice. The defendant is not, therefore, entitled to relief on the basis of this issue.

## <u>CONCLUSION</u>

After review of the record and the applicable law, we affirm the defendant's convictions and sentences.