IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2016

## JEROME SIDNEY BARRETT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2007-D-3201      Steve R. Dozier, Judge**

_____

**No. M2015-01143-CCA-R3-PC – Filed September 12, 2016**

_____

The Petitioner, Jerome Sidney Barrett, appeals from the post-conviction court's denial of relief from his conviction for first degree premeditated murder.[1]  In this appeal, the Petitioner argues that he received ineffective assistance of counsel and that the post-conviction court erred in denying his request for independent DNA testing.  Upon review, we are compelled to reverse the judgment of the post-conviction court and remand for new hearings to determine whether the Petitioner is entitled to post-conviction relief and independent DNA testing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Ryan Craig Caldwell, Nashville, Tennessee, for the Petitioner, Jerome Sidney Barrett.

Herbert H. Slatery III, Attorney General and Reporter; Matthew Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Thomas B. Thurman, Deputy District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Although we must reverse this case on procedural grounds, due to the complexity of the issues raised in the pro se and the amended post-conviction petitions as well as the motion for independent DNA testing, a brief review of the underlying facts supporting the Petitioner's conviction is necessary.  On February 2, 1975, the victim's partially nude, lifeless body was found on her bed in her apartment located near Vanderbilt University in

---

[1] The Petitioner has an unrelated post-conviction matter currently pending in Davidson County. See Jerome Sidney Barrett v. State, No. M2015-01161-CCA-R3-PC.

Nashville, Tennessee. See State v. Jerome Sidney Barrett, No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *1 (Tenn. Crim. App. July 18, 2012), perm app. denied (Tenn. Dec. 12, 2012). No suspects were charged in the initial investigation of the victim's death. Thirty years later, the Homicide Cold Case Unit of the Metropolitan Police Department reopened the case and began investigating the Petitioner based on similar offenses for which he was convicted in Davidson County near the time of the victim's death. In addition, certain items collected from the crime scene were submitted to the Tennessee Bureau of Investigation (TBI) for DNA testing, which resulted in a positive match to the Petitioner's DNA. Id. at *9. In November 2007, the Petitioner, an African-American male in his late twenties when the offense occurred, was indicted by the Davidson County Grand Jury for one count of first degree premeditated murder and one count of first degree felony murder relating to the victim's death. See T.C.A. § 39-2402 (1975) (amended 1977, 1979, 1988) (renumbered at § 39-2-202) (repealed 1989) (current version at T.C.A. § 39-13-202).

The proof adduced at the Petitioner's three-day jury trial, which began on January 27, 2009, showed that the night before the victim's body was found, she had gone on a date, consumed alcohol, and twice vomited.[2] She was eventually dropped off at her apartment sometime after midnight. Jerome Sidney Barrett, No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *2-3. The next day, the victim's brother and father went to her apartment and found the victim lying on the bed, nude except for a blouse. Id. They called the police, and investigating officers gathered various items of evidence from the victim's apartment. They did not wear gloves, which was common practice at the time. Id. at *5. A latent fingerprint expert analyzed the prints recovered from the scene, but they were never compared to elimination prints from the officers on the scene, the victim, the victim's family, neighbors, or friends. They were compared to those of the Petitioner and determined not to be his. Based on FBI testing from 1975, forcibly removed "Negroid" head hairs were found on a blanket, a sheet, and blue jeans recovered from the victim's apartment. In addition, "Negroid" pubic hairs were found on a blanket, a sheet, blue jeans, and a bedspread, as well as the victim's pubic hair combings. Id. at *7. Caucasian head hairs, dissimilar from the victim's, were also found on a blanket and a sheet. The victim had no known health issues at the time of her death, had only recently moved to her apartment, and had attended Vanderbilt University for a semester. Id. at *8.

After this case was reopened, Detective Bill Pridemore, the lead investigator, submitted the following items to the TBI for testing: a blouse, a white comforter, a pillow and pillow case, a quilt, a yellow striped blanket, a striped bed sheet, another sheet, panties, hairs and pubic hair combings, and fingernail clippings and scrapings. Detective Pridemore did not send the blue jeans to the TBI and was unable to locate

---

[2] On cross-examination, the victim's date acknowledged that in his prior statement to the police, he said that his date with the victim was on January 28, 1975.

-2-

slides containing hair and fibers that had been recovered by the FBI in 1975. Two hairs recovered from a blanket were tested and did not belong to the Petitioner. Id. at *9.

After the TBI identified DNA from the evidence Detective Pridemore submitted, known profiles of the victim's family members, the victim, and a known convicted felon living in the area at the time of the offense were excluded using the CODIS database. Detective Pridemore later learned that the Petitioner had lived in an apartment near Vanderbilt University and had been stopped by police officers on the Vanderbilt campus on two occasions near the time of the offense. Id. Detective Pridemore eventually located the Petitioner in Memphis and served a search warrant for the Petitioner's DNA samples, which were used for comparison in DNA testing. Id. At trial, TBI Special Agent Chad Johnson testified as an expert in DNA analysis regarding the results of the State's DNA testing. Id. at *13. This court summarized his testimony as follows:

> Special Agent Johnson testified that he received evidentiary items from the victim's case at various times. He identified the items: the victim's blouse, a blanket, a comforter, a pillow, a striped sheet, a white sheet, a quilt, a pillow and pillow case, panties, fingernail clippings, blood samples, and swabs. He said the blood samples were from Paul Slaton, John Watkins, the victim's younger brother, and Mark Trouvillion. The swabs were from Ben Blanton, the victim's father, and the [Petitioner]. He said a unique case number was used to identify the evidence while it was in the laboratory. He explained the protocol for receiving, storing, and transferring evidence within the laboratory.
>
> Special Agent Johnson identified his October 23, 2008 report, which was received as an exhibit. He said that most of the evidence he received was not ideal for DNA testing due to its age and small quantity but that there was a sufficient amount to test. He said that the comforter contained sperm, that the DNA was consistent with that of the victim's younger brother, and that the possibility of it matching someone else was more than one in six billion. He said that the pillowcase contained semen but that it was an insufficient sample for comparison and that there were two female profiles from a chemical found in saliva. One was identified as most likely being the victim's based upon comparison with the victim's father's DNA standard. He characterized this as a "half-match" and noted that the victim's deceased mother's DNA was unavailable. He said there was semen from an unknown male and a chemical from the victim's saliva on the pillow that accompanied the pillow case.

Special Agent Johnson testified that he received the [Petitioner's] swabs on October 29, 2007, and that he had already examined the other evidence at this point. He said that the [Petitioner's] DNA profile matched that found on the quilt and that the probability of another person having the same DNA profile exceeded the world population. The same was true of DNA from semen on the striped blanket. He said that at Detective Pridemore's request, he collected hairs from the striped blanket that became detached during the testing, although the normal policy of the laboratory was not to collect hairs from evidence. He said many hairs remained on the blanket. He said the striped sheet contained semen that was a partial DNA match to the [Petitioner]. He said that he was able to match three of the thirteen loci and that the probability of another person having a profile that matched the same three loci was one in 6600 in the African-American population, one in 5500 in the Caucasian population, one in 16,000 in the Southeastern Hispanic population, and one in 19,000 in the Southwestern Hispanic population. He said there was a second partial profile that was consistent with the victim's DNA profile.

Special Agent Johnson testified that the white sheet contained semen and human blood. He said that the blood stain contained both a male and a female profile and that neither was consistent with the known profiles he received. He obtained a partial profile from the semen, which he said was consistent at five loci with the [Petitioner's] DNA sample. The probability of another person having the same profile was one in 560,000 in the African-American population, one in 490,000 in the Caucasian population, one in 2.6 million in the Southeastern Hispanic population, and one in 4.5 million in the Southwestern Hispanic population. He was "almost certain" a larger stain toward the bottom of the sheet was from the victim's losing bladder control at the time of death, although he did not perform any testing to verify this. He noted that the stain aligned with other layers of bedding that were underneath the body. He said that "H.R. Jones" and "HRJ" were written on the sheet. He said he did not have a known sample from someone with that name. He said it was possible for DNA to survive laundering.

Special Agent Johnson testified that he identified semen with the [Petitioner's] complete DNA profile on the victim's blouse. He said the possibility that another person had the same DNA profile was one in a number that exceeded the world's population. He said that he was not able to find any semen on the victim's panties but that he obtained a limited female DNA profile that was consistent with a better profile from the

pillow that he assumed was the victim's. He said the victim's fingernail clippings first revealed a very limited partial profile but in a second test revealed two profiles. The larger profile was consistent with the [Petitioner's] DNA, and the smaller was consistent with the DNA from the pillow that was presumed to be the victim's. He said the probability that another person had the same DNA profile was one in over six billion. He said that typically, the victim would be the larger contributor of DNA to fingernail clippings evidence. He said a total of six items of evidence contained DNA with a profile consistent to the [Petitioner]. He said that for four of the six items, the chance of someone other than the [Petitioner] having the same DNA profile was one in more than the world's population.

Id. at *13-14.

In addition to proof regarding DNA testing, the State also introduced expert testimony regarding the victim's cause of death. Dr. John Petrone, the medical examiner who had performed an autopsy on the victim in 1975, determined that the victim's cause of death was asphyxiation, either by strangulation or from choking on vomit. Id. at *10. However, Dr. Petrone was deceased at the time of the 2009 trial and his 1975 autopsy report could not be located. Id. at *11. During the cold case investigation, Dr. Bruce Levy, the Tennessee Chief Medical Examiner and Davidson County Medical Examiner, reviewed the victim's death certificate, the medical examiner's report prepared by Dr. Petrone, photographs taken at the crime scene, police reports, laboratory reports, and newspaper clippings. Id. at *10. At trial, Dr. Levy testified extensively regarding the victim's cause of death. Although Dr. Levy agreed with Dr. Petrone's determination of the cause of the victim's death as asphyxia, he said "it was difficult to tell, however, if the victim was suffocated, strangled, or both" and concluded that the manner of death was homicide. Id. at *10-12.

The Petitioner did not offer proof at trial. Following deliberations, the jury convicted the Petitioner of first degree premeditated murder, for which he received a sentence of life imprisonment. Id. at *16. On direct appeal, the Petitioner alleged nine grounds for relief. Id. at *1. This court affirmed both his conviction and sentence, and the Tennessee Supreme Court denied his application for permission to appeal. On November 12, 2013, the Petitioner filed a pro se petition for post-conviction relief. The post-conviction court appointed private counsel, who filed an amended petition on January 27, 2015, alleging, inter alia, that the Petitioner received ineffective assistance of counsel and was entitled to the services of an independent DNA expert under the Post-Conviction DNA Analysis Act of 2001.

**Post-Conviction Hearing.** At the beginning of the March 13, 2015 post-conviction hearing, the Petitioner attempted to fire post-conviction counsel and requested the court to either continue his case or allow him to proceed pro se. He also requested the post-conviction court to accept his pro se petition rather than the amended petition submitted by counsel. The Petitioner said that post-conviction counsel had not spoken to him, had just given him the amended petition the morning of the hearing, and that he did not know "what [post-conviction counsel] was fixing to do." In response, the court denied the Petitioner's request for a continuance and said, "we are going forward on it." The Petitioner persisted in his right to represent himself, to which the court told post-conviction counsel to proceed and for the Petitioner to "have a seat." The Petitioner later insisted on the post-conviction court considering his pro-se petition for post-conviction relief rather than the amended petition, to which the court replied, "It's here."

The post-conviction court combined the hearing requesting independent DNA testing with the hearing considering the ineffective assistance of counsel claim. The Petitioner and trial counsel were the only witnesses to testify. At the conclusion of the hearing, the post-conviction court took the matter under advisement, and a written order denying relief was issued on May 18, 2015. It is from this order that the Petitioner now timely appeals.

## ANALYSIS

In remanding this matter to the post-conviction court, it is necessary to provide the chronology of the Petitioner's pro se filings and the response, or lack thereof, by appointed counsel. On November 12, 2013, the Petitioner filed an 82-page, type-written pro se petition for post-conviction relief alleging over 30 grounds for relief. After not receiving a response from post-conviction counsel, the Petitioner filed an amended petition on March 24, 2014, noting appointed counsel's lack of contact and requesting recusal of the post-conviction court pursuant to Tenn. Code Ann. Section 40-30-105(b).[3] The Petitioner did not assert that he was indigent or that he needed the assistance of appointed counsel. On January 27, 2015, over a year after the post-conviction court entered its December 17, 2013 order appointing post-conviction counsel, post-conviction counsel filed an amended petition for post-conviction relief on the Petitioner's behalf. It did not incorporate the Petitioner's pro se petition for post-conviction relief.

At the beginning of the post-conviction hearing, the Petitioner said that he did not adopt or approve of the amended petition filed by post-conviction counsel and that he wanted to proceed pro se.[4] In support, the Petitioner stated that (1) post-conviction

---

[3] The record does not contain a response to the Petitioner's request for the post-conviction court to recuse itself.

[4] Based on the volume of appellate court filings dating back to 1976, the Petitioner is very

counsel had not communicated with him until the day of the hearing; (2) that he did not know that he was going to have the hearing the day he was summoned to court; (3) that post-conviction counsel had not subpoenaed certain witnesses, namely Frank White; and (4) that post-conviction counsel had not investigated or subpoenaed documents relating to his claim concerning Dr. Levy. Post-conviction counsel did not dispute the Petitioner's claims. Nevertheless, the Petitioner's requests to continue the matter or to proceed pro se were summarily denied by the post-conviction court.

This court reviews a trial court's decision to grant or deny a continuance for an abuse of discretion. State v. Hester, 324 S.W.3d 1, 35 (Tenn. 2010). An abuse of discretion may be found if "the denial of the continuance either deprived the defendant of a fair trial or caused an outcome that would not have occurred had the continuance been granted." Id. (citing State v. Rimmer, 250 S.W.3d 12, 40 (Tenn.2008)(appendix)). In this case, we are compelled to conclude that the post-conviction court improperly denied the Petitioner's request for a continuance. The Petitioner requested a continuance or to proceed pro se in light of post-conviction counsel's lack of contact, familiarity with his case, and failure to subpoena witnesses. On the record before us, it is clear that post-conviction counsel failed to comply with Rule 28. See Tenn. Sup. Ct. R. 28, § 6(C)(2)

familiar with the court system. See Jerome Sydney Barrett v. State, No. B-6413 (Tenn. Crim. App., at Nashville, Feb. 1, 1977), perm. app. denied (Tenn. 1977), and cert. denied (1977); Jerome Sidney Barrett v. State, No. 87-274-III, 1988 WL 126853, at *1 (Tenn. Crim. App., at Nashville, Nov. 29, 1989) (appeal of the denial of post-conviction relief), perm. app. denied (Tenn. Apr. 3, 1989), and cert denied (Nov. 4, 1996), and reh'g denied, No. 01C01-9605-CR-000193 (Tenn. Crim. App., at Nashville, June 26, 1996); Jerome Sidney Barrett v. State, No. 02C01-9201-CR-00022, 1993 WL 8605, at *1 (Tenn. Crim. App., at Jackson, Jan. 20, 1993) (reversal and remand of the denial of post-conviction relief from the Petitioner's conviction for unlawful carnal knowledge of a female under age twelve, where the pro se Petitioner, alleging twenty-eight grounds for relief, was not appointed counsel on appeal); Jerome Sidney Barrett v. State, No. 02C01-9307-CR-00154, 1994 WL 25826, at *1 (Tenn. Crim. App., at Jackson, Jan. 26, 1994), perm. app. dismissed (Tenn. June 5, 1995); Jerome Sydney Barrett v. Billy Compton, Warden, No. 96-7540, 1997 WL 166043, at *1 (Tenn. Crim. App., at Jackson, Apr. 9, 1997); Jerome Sydney Barrett v. State, No. 02C01-9508-CC-00233, 1997 WL 81658, at *1 (Tenn. Crim. App., at Jackson, Feb. 27, 1997), perm. app. denied (Tenn. Nov. 17, 1997); Jerome Sydney Barrett v. State, No. W1999-01171-CCA-R3-CO, 1999 WL 1097839, at *1 (Tenn. Crim. App. Nov. 23, 1999), perm. app. dismissed (Tenn. May 22, 2000), and reh'g denied (Tenn. Crim. App. July 31, 2000); Jerome Sydney Barrett v. TDOC, No. M2001-00475-COA-R3-CV, appeal voluntarily dismissed (Tenn. Ct. App. Feb. 21, 2002); State v. Jerome Sidney Barrett, No. M2009-02636-CCA-R3-CD, 2012 WL 2870571, at *1 (Tenn. Crim. App. July 13, 2012), perm. app. denied (Tenn. Dec. 12, 2012); State v. Jerome Sidney Barrett, No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *1 (Tenn. Crim. App. July 18, 2012), perm. app. denied (Tenn. Dec. 12, 2012); Jerome Sidney Barrett v. State, No. M2012-01778-CCA-R3-CO, 2013 WL 3378318, at *1 (Tenn. Crim. App. July 1, 2013) (appeal of the summary dismissal of a petition for writ of error coram nobis, alleging (1) that the DNA evidence used at trial was not independently evaluate; and (2) that the forensic pathologist that testified at trial, Dr. Bruce Levy, was not a credible witness because he was arrested for drug crimes in Mississippi a year after trial), perm. app. denied (Tenn. Nov. 13, 2013).

(requiring post-conviction counsel to interview relevant witnesses, including the petitioner and prior counsel, and diligently investigate and present all reasonable claims). Post-conviction counsel did not meet with the Petitioner until the day of the hearing, several of the Petitioner's issues were not developed or investigated, and there is no Rule 28 certification in the record confirming that post-conviction counsel had thoroughly investigated the possible constitutional violations, had discussed them with the Petitioner, and had raised all non-frivolous constitutional grounds warranted by existing law. Under these circumstances, the denial of a continuance deprived the Petitioner of a fair post-conviction hearing.

We are further compelled to note that "[w]hile the constitutional right to self-representation does not apply to post-conviction proceedings, both the statutes authorizing the appointment of counsel in post-conviction proceedings and the rules implementing these statutes recognize that prisoners have the right of self-representation in post-conviction proceedings". Lovin v. State, 286 S.W.3d 275, 285 (Tenn. 2009). Prisoners may represent themselves if they do not request a lawyer or decline to accept an appointed lawyer if one is offered; however, such refusal must be in writing and is only effective when the court is satisfied that the prisoner fully understands the right to counsel and the consequences of proceeding pro se. See Tenn. Sup.Ct. R. 13, §§ 1(e)(3), (f)(1)-(2).

A prisoner's request to represent himself or herself in a post-conviction proceeding must (1) be asserted in a timely manner; (2) be clear and unequivocal; and (3) reflect a knowing and intelligent waiver of the right to counsel. See Lovin, 286 S.W.3d at 287-88. To assure that the prisoner's waiver of his or her right to appointed counsel is knowing and intelligent, the court must conduct an intensive hearing on the record to advise the prisoner of the consequences of self-representation and to determine that the prisoner knows and understands the consequences of his or her decision. See Cottingham v. Cottingham, 193 S.W.3d 531, 536 (Tenn. 2006).

The post-conviction court did not comply with the above authority in assessing the Petitioner's unequivocal request to represent himself. Accordingly, we reverse and remand this matter to the post-conviction court to determine whether the Petitioner is able to proceed pro se. If the post-conviction court determines that the Petitioner is not competent to proceed pro se, then the court shall appoint new counsel to represent the Petitioner at his post-conviction hearing. In remanding this matter, we are not making any determination as to the merit of the issues raised by the Petitioner. Based on the totality of the record before us, we simply believe that remand is the appropriate remedy in this case.

# CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse the judgment of the post-conviction court and remand this matter for proceedings consistent with this opinion.

_____
CAMILLE R. McMULLEN, JUDGE